# In the United States Court of Federal Claims

DEVTECH SYSTEMS, INC,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

VERITAS MANAGEMENT GROUP, INC.,

Intervenor-Defendant.

No. 24-cv-1792

Filed Under Seal: April 16, 2025

Publication: May 1, 2025[1]

*David B. Dixon* of Pillsbury Winthrop Shaw Pittman LLP, McLean, VA, argued for Plaintiff. With him on the briefs were *Toghrul M. Shukurlu*, *Aleksey R. Dabbs*, and *Alexis P. Landrum* of Pillsbury Winthrop Shaw Pittman LLP, McLean, VA.

*Antonia R. Soares* of the United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant. With her on the briefs were *Patricia M. McCarthy* and *Deborah A. Bynum*, of the United States Department of Justice, Civil Division, Washington, D.C., and *David A. Lank* of the Office of the General Counsel, United States Department of Health & Human Services.

*Gordon Griffin* of Holland & Knight LLP, Washington, D.C., argued for Intervenor-Defendant. With him on the briefs were *John M. McAdams III* and *Tanner N. Slaughter* of Holland & Knight LLP, Washington, D.C.

---

[1] This Memorandum and Order was filed under seal in accordance with the Protective Order entered in this action. ECF No. 9. On April 30, 2025, the parties filed a Notice proposing redactions to the Memorandum and Order. ECF No. 44. The sealed and public versions of this Memorandum and Order are identical, except for some redactions, this footnote, the publication date, and corrections to minor typographical errors.

## MEMORANDUM AND ORDER

In 2003, Congress enacted the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003.  22 U.S.C. § 7601, *et seq.*  This Act created the President's Emergency Plan for AIDS Relief (PEPFAR), which is "the largest health program worldwide for a single disease."  *About the President's Emergency Plan for AIDS Relief (PEPFAR)*, Health Res. & Servs. Admin  (Dec.  2023),  https://www.hrsa.gov/office-global-health/global-hivaids-program/about-pepfar.  PEPFAR is supported by several federal agencies, including the United States Department of Health and Human Services (HHS); the United States Agency for International Development (USAID); the United States Department of Defense; and the Peace Corps.  *Id.*

On September 27, 2024, the Health Resources and Services Administration (HRSA or Agency) awarded to Veritas Management Group, Inc. (Veritas or VMG) a task order for technical professional staffing to support PEPFAR.  Plaintiff DevTech Systems, Inc. (DevTech) challenges that decision in this post award bid protest.  Specifically, DevTech—which proposed a price more than double Veritas's and over five times the Agency's internal price estimate—challenges the Agency's decision as arbitrary and capricious on two grounds.  First, DevTech asserts that Veritas was ineligible for award because its proposal failed to respond to several material provisions of the Solicitation.  Second, DevTech contends that the Agency erred in its evaluation of certain parts of DevTech's proposal.  Pending before the Court are the parties' Cross-Motions for Judgment on the Administrative Record.  As explained further below, the Court grants the Agency's and Veritas's respective Motions for Judgment on the Administrative Record and denies DevTech's Motion for Judgment on the Administrative Record, as the Agency's actions were not arbitrary and capricious.

**BACKGROUND**

I.    **Procedural History**

DevTech filed its Complaint on October 31, 2024, and subsequently amended its Complaint twice—first on December 20, 2024 and again on January 13, 2025. *See* Complaint (ECF No. 1); First Amended Complaint (ECF No. 23); Second Amended Complaint (ECF No. 28) (Am. Compl.).  As noted, DevTech challenges the decision of the Agency to award a task order (RFP No. 75R60224Q00135) (Solicitation) to Veritas for technical assistance supporting PEPFAR initiatives.  Am. Compl. ¶ 1.  On November 7, 2024, Veritas filed an Unopposed Motion to Intervene, which this Court granted on the same day. *See* ECF No. 10; Order, dated Nov. 7, 2024 (ECF No. 14).

On November 27, 2024, pursuant to this Court's Scheduling Order, the Agency made the Administrative Record (AR) available for review.  Scheduling Order, dated Nov. 22, 2024 (ECF No. 21); Notice (ECF No. 22).  The Agency subsequently amended the AR on January 7 and January 10, 2025. *See* ECF Nos. 25, 26.  On January 13, 2025, Plaintiff timely filed its Second Amended Complaint, and the parties filed their Opening Motions for Judgment on the Administrative Record (MJAR).[2]  On January 31, 2025, the parties filed their Responsive MJARs,[3] and on February 20, 2025, the Court conducted oral argument. *See* Transcript, dated Feb. 20, 2025

---

[2] *See* Am. Compl.; Veritas's Cross-Motion for Judgment on the Administrative Record (ECF No. 27) (Veritas MJAR); DevTech's Motion for Judgment on the Administrative Record (ECF No. 29-1) (DevTech MJAR); Agency's Motion for Judgment on the Administrative Record (ECF No. 30) (Agency MJAR).

[3] Veritas Reply in Support of its Motion for Judgment on the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 33) (Veritas Resp. MJAR); Plaintiff's Opposition to Defendant's and Defendant-Intervenor's Motions for Judgment on the Administrative Record (ECF No. 34) (DevTech Resp. MJAR); Defendant's Reply in Support of its Motion for Judgment on the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 35) (Agency Resp. MJAR).

(ECF No. 41) (OA Tr.).  During oral argument, the Court granted DevTech's request for leave to file a sur-reply to address issues raised at argument regarding the parties' proposed project managers, which it filed on February 27, 2025.  ECF No. 39 (Sur-Reply); *see also* OA Tr. 133:4–134:13; Minute Order, dated Feb. 20, 2025.  Accordingly, the parties' Cross-MJARs are fully briefed and ripe for review.

## II.    The Solicitation

The Solicitation underlying this post-award bid protest is for a task order, issued on September 4, 2024 as a request for proposal (RFP) through the General Services Administration's (GSA) eBuy website, which facilitates Government purchases of commercial goods via GSA Multiple Award Schedule (MAS) contracts.  AR222–23; FAR 8.402(d).[4]  The Solicitation sought bids for a contract "to provide Technical Assistance (TA) to support [the Agency's Office of Global Health (OGH)] in advancing PEPFAR initiatives," which "includes aiding in programming, strategic planning, communication, scientific publication, analytics, site visits, and staff development for effective implementation."  AR300.  The "support encompasses providing necessary personnel and services to execute the tasks outlined" in the RFP.  AR408.  The Agency anticipated issuing a firm-fixed price task order for a twelve-month period—the Base Period—with four twelve-month Option Periods to follow.  AR405; AR408.

The MAS program, which is also known as the Federal Supply Schedule (FSS) program, is managed by GSA and provides a simplified avenue for federal agencies to procure commercial supplies and services at prices associated with volume buying.  FAR 8.402(a); *see also Land Shark Shredding, LLC v. United States*, 842 F. App'x 594, 595 (Fed. Cir. 2021); *Coast Pro., Inc. v.*

---

[4] The Federal Acquisition Regulation (FAR) is contained in Chapter 48 of the Code of Federal Regulations.  Thus, all references to the FAR are shorthand for "48 C.F.R. §."

*United States*, 828 F.3d 1349, 1351–52 (Fed. Cir. 2016).  The program is streamlined because pre-approved contractors publish a price list containing the pricing and terms and conditions for services that the contractor offers, already determined to be fair and reasonable.  *See Land Shark*, 842 F. App'x at 595 (citing FAR 8.402(a), (b)); *Coast Pro.*, 828 F.3d at 1351.  Agencies then post requirements and obtain quotes through the GSA's eBuy System.  *Land Shark*, 842 F. App'x at 595.  Orders placed against GSA MAS contracts are "'considered to be issued using full and open competition' even though they are not subject to FAR Part 15, which prescribes procedures for most negotiated contracts."[5]  *Coast Pro.*, 828 F.3d at 1351–52 (quoting FAR 8.404(a)).

The Solicitation required offerors to submit their proposals in four separate volumes: the Technical Proposal (Volume I), the Past Performance Proposal (Volume II), the Price Proposal (Volume III), and Voluntary Product Accessibility Template (VPAT) language (Volume IV).  AR382.  To make a best value decision, the Agency employed a "Trade-off Evaluation process."  AR391.  The Solicitation notes that the "Technical [factor] is more important than the Past Performance [factor]."  *Id.*  Further, "[w]hen combined, the non-price factors (Technical and Past Performance) are significantly more important than Price."  *Id.*  The Solicitation, however, explained that if "the evaluation reveals that two (2) or more proposals are approximately equal in non-price factors, then price will become significantly more important."  *Id.*  This is because "[t]he Government will not make an award at a significantly higher overall cost to the Government to achieve only slightly superior performance."  AR392.  Despite requiring four proposal volumes, the Agency's evaluation and best value decision for the contract award were limited to Volumes I

---

[5] Task orders under GSA MAS contracts are protestable events under Section 1491(b) and are not subject to the task order protest bar under the Federal Acquisition and Streamlining Act of 1994. *Coast Pro.*, 828 F.3d at 1354 & n.4.

through III and did not include Volume IV, VPAT language.  AR391.  DevTech's challenges largely focus on Volume I, Technical Proposal, and Volume IV, VPAT Proposal.  *See generally* DevTech MJAR.  Accordingly, the Court provides a detailed background of the Solicitation as related to those volumes.

### A.    Volume I, Technical Proposal

As an initial matter, the Solicitation states that "[f]ailure to follow all steps in the Task Order Request instructions may result in your task order proposal receiving no further consideration for award."  AR382.  The Solicitation then detailed its evaluation criteria for the Technical Proposal.  AR392–94.  It explained that the Technical Proposal would be evaluated on an adjectival basis where evaluators would assign an adjectival rating to each Technical Evaluation Criterion.  AR392.  The Solicitation defined the adjectival ratings as follows:

| Adjectival Rating | Description |
| --- | --- |
| Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths, which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses, which are not offset by strengths. Risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is not awardable. |

*Id*.  The Solicitation defined strengths and weaknesses, which "are the findings that support the assigned adjective rating" as follows:

| Support | Description |
|---------|-------------|
| Strength | An aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance. |
| Weakness | A flaw in the proposal that increases the risk of unsuccessful contract performance. |
| Significant Weakness | A flaw that appreciably increases the risk of unsuccessful contract performance. |
| Deficiency | A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. |

*Id.*

The Technical Proposal was comprised of five "Factors": (1) Technical Approach; (2) Understanding the Project; (3) Key Personnel; (4) Management and Staffing Plan; and (5) Organizational Experience and Expertise. AR383. As DevTech's Technical Proposal challenges only pertain to Factors 1 and 3, the Court describes only those factors more fully below.

### 1.    Technical Proposal (Volume I), Factor 1: Technical Approach

For Factor 1, Technical Approach, the Solicitation required the proposal to "fully describe the proposed technical approach to meet each of the requirements specified under the Statement of Work." *Id.* More specifically, the Solicitation required proposals to include, among other things:

- A detailed description of the content of each task and subtask to be performed to achieve the project objectives.

- A discussion of the methodology and workplan to be used for individual tasks or subtasks and scheduling of time and persons.

- A discussion of workflow efficiency, appropriateness of approach, and efficiency of resources.

- A discussion of anticipated major problem areas, together with potential approaches for their solution.

*Id.*

As part of the Technical Proposal, the Statement of Work (SOW) included 20 tasks, nine of which were considered "optional."  AR409–34 (Required Tasks); AR434–38 (Optional Tasks).  The Optional Tasks could be exercised "upon the request" of the Agency.  AR434.  Each offeror's proposal was to address and price these Required and Optional Tasks.  *See* AR409–38.

The SOW included a "Payment Schedule," reproduced below.  This chart appears to list the quantity of tasks that the Agency expected offerors to complete for the Base Period.  AR444–45 (Payment Schedule for Base Period).  Additional charts were included for tasks that the Agency expected offerors to complete for each subsequent Option Period.  AR446–51.

**VI. Payment Schedule**

| Description | Percentage | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| **Optional Tasks** | | | | |
| Orientation, Trainings, and Learning Sessions | | 2 | | |
| Comprehensive Site Visits | | 10 | | |
| Technical Assistance Site Visits | | 22 | | |
| Diagnostic Site Visits | | 9 | | |
| Special Projects | | 8 | | |
| Adhoc Reports | | 12 | | |
| Program Evaluation | | 2 | | |
| Educational Products, Tools, Manual and Resource Development | | 3 | | |
| Research Reports, Policy and Data Analysis | | 4 | | |
| Summary Presentation | | 4 | | |
| Analytical Projects | | 3 | | |

AR444–45 (Payment Schedule for Base Period).

In addition to the Payment Schedule, the SOW included a "Tasks Section," which also provided a maximum quantity for each of the Optional Tasks that the Agency could exercise.  AR434–38 (Tasks Section).  There was, however, a discrepancy between the maximum quantity of Optional Tasks listed in the Tasks Section and the quantity of Optional Tasks included in the

Payment Schedule.  *Compare id.*, *with* AR444–51; *see also* AR297 (stating that "[o]fferors will use the payment schedule in the SOW to build their price propos[a]l.").

Optional Task 2 included three separate site visits.  Specifically, the quantities for those three site visits under Optional Task 2, "Comprehensive Site Visit[s]," "Technical Assistance Site Visit[s]," and "Diagnostic Site Visit[s]," differ between the Payment Schedule and the Tasks Section.  *Compare* AR434–38, *with* AR444–51.  The Tasks Section provides that comprehensive site visits and technical assistance site visits can be exercised up to two times per period while diagnostic site visits can be exercised up to three times per period.  AR434.  Meanwhile, the Payment Schedule lists the quantity for those site visits as 10, 22, and 9, respectively.  AR445.  For Optional Task 9, "Analytical Projects," the Tasks Section provided that the Agency could exercise the Optional Task three times but only during Option Period One and Option Period Two.  AR438.  The Payment Schedule, however, included three Analytical Projects for the Base Period and each of the Option Periods.  AR445–51.  The chart below illustrates these discrepancies in the quantities proposed for the Base Period.

| Optional Task | Quantity Listed in Payment Schedule for Base Period | Quantity Listed in Tasks Section for Base Period |
|---|---|---|
| Comprehensive Site Visits | 10 | 2 |
| Technical Assistance Site Visits | 22 | 2 |
| Diagnostic Site Visits | 9 | 3 |
| Analytical Projects | 3 | 0 |

AR434; AR438; AR445.

### 2.    Technical Proposal (Volume I), Factor 3: Key Personnel

Under Factor 3, Key Personnel, which is also part of the Technical Proposal (Volume 1), the Solicitation required that offerors provide:

- "short descriptions of key personnel and their qualifications in the technical proposal. Bios and full resumes for all personnel proposed for this project should be in the appendix. Each resume, in the appendix, shall not be longer than five (5) pages," AR384; and

- "the types of professional persons who will perform the contract activities, including their education, previous experience relevant to PEPFAR specific programs, and specific technical accomplishments essential to the performance of the project, degrees, specialized training, and up-to-date certifications/licensure." *Id.*

The instructions in the Solicitation for Factor 3 included comprehensive descriptions of five positions that were "required to be part of the Offeror's proposal": (i) Project Manager, (ii) Project Assistant, (iii) Research Analyst/Advisor (RAA), (iv) TA Specialist/ Research Analyst (TA/RA); and (v) Social Science Analyst, Write/Editor (SSA).  AR383–88.

### B.    Volume IV, Voluntary Product Accessibility Template (VPAT) Proposal

The Solicitation also required that each offeror submit a VPAT Proposal volume.  AR382. The Agency's Section 508 compliance team, not the Technical Evaluation Panel (TEP), evaluated the VPAT Proposals.  AR2374.15–18.  The VPAT requirement stems from Section 508 of the Rehabilitation Act, 29 U.S.C. § 794d, which requires that digital content is accessible to those with disabilities.  AR438–39; Agency MJAR at 11–12;[6] *see also* AR438 ("Section 508 requires that all external public facing content and non-public facing official agency communications be accessible.").  Accordingly, the Solicitation instructed offerors to "complete and submit the applicable HHS Section 508 Accessibility Compliance Checklist."  AR439.

---

[6] Citations throughout this Memorandum and Order correspond to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

Rather than the adjectival reviews used to rate the Technical Proposals, VPAT Proposals were assigned a "color" rating as follows:

| Rating | Description |
|---|---|
| Green | EIT Products fully meet intent of all applicable Section 508 Provisions.  Risk of failure to meet all Section 508 Requirements is very low. |
| Yellow | EIT Products can be made capable of meeting the intent of all applicable Section 508 Provisions by using alternative methods for some or all of the products.  Risk of failure to meet all Section 508 Requirement is low. |
| Red | EIT Products fail to meet the intent of any of the applicable Section 508 or the PAT is materially incomplete.  Risk of failure to meet all Section 508 Requirements is high. |

AR396.  The Solicitation specified that the Agency's "evaluation of the VPAT [was] independent from the other factors" and was based on the offeror's ability to meet the Section 508 requirements. *Id.*  The Section 508 compliance team explained in an email to the contracting officer that VPAT Proposals rated red are not acceptable for award while proposals rated yellow or green "are acceptable to be offered a[n] award."  *See* AR2374.1.  Thus, the VPAT Proposal volume could only affect the overall award to an offeror if the Agency rated its VPAT Proposal red.  *Id.*; *see also* AR391; AR396.

## III.    Submission and Evaluations of Proposals

Eight offerors, including DevTech and Veritas, submitted proposals.  AR2384; *see also* AR641–747 (DevTech Proposal); AR1632–1830 (Veritas Proposal).   A three-member TEP reviewed each offeror's Technical Proposal.  AR1834–35.  First, each TEP member individually reviewed each proposal, assigning an adjectival rating.  AR1834.  After individually assigning ratings, the TEP met collectively for a "consensus meeting" to discuss each proposal and "reconcile differences" between the individual evaluations.  *Id.*  The TEP members then consolidated their findings into the Agency's Consolidated Evaluation Report.  AR2063–2100 (Agency's Consolidated Evaluation Report).

The TEP rated DevTech's and Veritas's respective Technical Proposals as Outstanding—the highest possible rating. AR2063. The TEP panel did not assign any weaknesses to DevTech's proposal. AR2069–74. The panel assigned three weaknesses to Veritas's proposal. AR2096–2100. Notwithstanding those three weaknesses, Veritas's proposal—like DevTech's—received Outstanding ratings overall and for each of the five technical evaluation factors that made up Volume I, Technical Proposal. AR2069–74; AR2096–2100; AR2386–87.

For proposal Volume II, Past Performance, which was not discussed in detail above, offerors received two ratings, one for relevancy and the other for performance confidence. *See* AR395. For relevancy, both DevTech and Veritas received "Very Relevant" ratings—the highest rating. *Id.*; AR2387. For performance confidence, however, Veritas received an "Exceptional" rating—the highest available rating—while DevTech received a "Very Good" rating—the second highest. AR395; AR2387–88.

Turning to price, DevTech's proposal of ███████ was (i) more than five times greater than the Agency's cost estimate of ██████, (ii) over ██████ higher than the next highest offer price, and (iii) more than double Veritas's bid. AR2388. Veritas's winning bid came in at $13,146,516.24, which is ██████ less than DevTech's bid. *Id.* All offerors' bids are reproduced below:

| Offeror | Total Bid |
|---|---|
| **DevTech Systems** | ████████ |
| ██████████████ | ████████ |
| ██████ | ████████ |
| **Veritas Management Group** | $13,146,516.24 |
| ██████ | ████████ |
| ██████ | ████████ |
| ████████ | ████████ |

| Offeror | Total Bid |
|---|---|
| Independent Government Cost Estimate (IGCE) | ██████████ |
| ████████████████ | ████████████ |

*Id.*

Finally, separate from these factors considered in making its best value determination, the Agency also rated the offerors' VPAT Proposals. AR391 (explaining criteria for best value determination); AR396 (noting "evaluation of the VPAT is independent from the other factors"); AR2383–90. The Agency's Section 508 compliance team rated DevTech's VPAT Proposal "RED," while it rated Veritas's VPAT Proposal "GREEN." AR2388–89. Specifically, DevTech was among four of the eight offerors to initially receive a red rating. AR2371–72. Subsequently, the Agency's contract specialist emailed each of these offerors requesting a revised VPAT Proposal. *See* AR2172–73; AR2236; AR2245–46; AR2365. The offerors each submitted a revised VPAT Proposal, which the contracting officer forwarded to the HRSA Section 508 compliance team for review. *See* AR2168–71; AR2234–35; AR2245; AR2363–64; AR2374.3. The Agency's Section 508 compliance team, however, pushed back on reviewing the amended proposals due to time constraints. AR2374.2. In response, the contracting officer agreed that going forward he would only send the compliance team revised proposals for re-evaluation "if it [would] impact[] the awardee decision." *Id.*; *see also* AR2390 (noting that "a second revision would not be conducted" unless the proposal was "submitted by the selected awardee"). Accordingly, the contracting officer did not submit any of the four offerors' revised VPAT Proposals for re-evaluation as none of these offerors prevailed in the separate, best value determination. *See* AR2371–74.18; AR2390; *see also* Agency MJAR at 44 (acknowledging that

the Agency did not reevaluate the revised VPAT Proposals); *infra* Background § IV (discussing results of best value determination).

## IV.    Best Value Determination

On September 27, 2024, the Agency determined that Veritas presented the best value to the agency. *See* AR2390. As required by the Solicitation, the Agency based its determination and analysis only on Volumes I through III—the technical, past performance, and price proposals. *See* AR2383–90. Meanwhile, the VPAT Proposals were evaluated separately and could only potentially affect the award determination to the extent an offeror received a red rating. AR391; AR2374.6–.7. For comparison, below is a chart comparing DevTech and Veritas's proposals related to the best value analysis (Volumes I–III):

|  | Technical | Past Performance — Relevancy | Past Performance— Performance Confidence | Price |
|---|---|---|---|---|
| **DevTech** | OUTSTANDING | VERY RELEVANT | VERY GOOD | ███████ |
| **VMG** | OUTSTANDING | VERY RELEVANT | EXCEPTIONAL | $13,146,516.24 |

Agency MJAR at 19 (citing AR2385–88).

## APPLICABLE LEGAL STANDARDS

The Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996, provides this Court with jurisdiction over bid protests. Bid protests proceed in two steps. *First*, the Court analyzes the procurement under the Administrative Procedure Act's (APA) standards to determine whether the Agency "acted without rational basis or contrary to law when evaluating the bids and awarding the contract." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); 28 U.S.C. § 1491(b)(4); *see Oak Grove Techs., LLC*

*v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024). *Second*, the Court considers whether the alleged errors prejudiced the protestor. *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citing *Bannum*, 404 F.3d at 1351).

At step one, the Court reviews the procurement under the standards set forth in the APA. 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021). The APA requires a reviewing court to determine whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974). Thus, to prevail in a post-award bid protest, a plaintiff must demonstrate that "(1) 'the procurement official's decision lacked a rational basis' or (2) 'the procurement procedure involved a violation of regulation or procedure.'" *DynCorp Int'l*, 10 F.4th at 1308 (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)). When a disappointed bidder alleges a violation of a regulation or procedure, the Court reviews whether there was "a clear and prejudicial violation of applicable statutes or regulations." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). When a bidder alleges that the procurement official's decision lacked a rational basis, the Court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp.*, 419 U.S. at 286. Indeed, "[a]lthough the inquiry

under the APA 'is to be searching and careful, . . . [t]he court is not empowered to substitute its judgment for that of the agency.'" *Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 786 (2022) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416–20 (1971)).

As the United States Court of Appeals for the Federal Circuit has explained, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa*, 238 F.3d at 1333); *see also Impresa*, 238 F.3d at 1333 (noting a similarly high burden for claims of a violation of regulation or procedure, which must involve "a clear . . . violation of applicable statutes or regulations"). Consistent with this high burden, agency decisions are "entitled to a presumption of regularity." *Impresa*, 238 F.3d at 1338 (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–27 (1986)).

Agencies possess "substantial discretion" to make decisions involving "the minutiae of the procurement process in such matters as technical ratings" or best value determinations. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (explaining that "a court will not second guess" certain matters, such as "technical ratings . . . , which involve discretionary determinations of procurement officials"); *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone." (quoting *E.W. Bliss Co.*, 77 F.3d at 449)). Indeed, this Court's "role in reviewing procurement decisions . . . is not to evaluate the offerors' proposals anew or to substitute [its] judgment for that of the agency." *Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1408 (Fed. Cir. 2021); *see also Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might,

as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.") (cleaned up).

At step two, this Court evaluates the factual question of prejudice. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) (citing *WellPoint Mil.*, 953 F.3d at 1377); *see Bannum*, 404 F.3d at 1357 (explaining that this Court's "factual determination on prejudice . . . is entitled to review for clear error like any finding in a bench trial"). Thus, "[t]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." *DynCorp Int'l*, 10 F.4th at 1308 (quoting *WellPoint Mil.*, 953 F.3d at 1377); *see also Sys. Stud. & Simulation*, 22 F.4th at 998 (noting that there is no presumption of prejudice following a procurement error by an agency). A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for that error." *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353); *see also REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (noting that a disappointed bidder must have "had greater than an insubstantial chance of securing the contract" (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003))). In other words, the disappointed bidder must have been "within the zone of active consideration." *Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1355 (Fed. Cir. 2015) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)); *see Frawner Corp. v. United States*, 161 Fed. Cl. 420, 455 (2022) (explaining that protestors must show that "barring the error the protestor would have been 'within the zone of active consideration'") (quoting *Off. Design Grp. v. United States*, 951 F.3d 1366, 1373–74 (Fed. Cir. 2020)).

In the Court of Federal Claims, bid protests are adjudicated under Rule 52.1(c), which provides an expedited trial on a "paper record, allowing fact-finding by the trial court." Rule

52.1(c) of the Rules of the United States Court of Federal Claims; *Bannum*, 404 F.3d at 1356 (referencing Rule 56.1, which was replaced by Rule 52.1(c)).   Unlike at summary judgment, genuine disputes of material fact do not preclude a court from granting a motion for judgment on the administrative record.  *Bannum*, 404 F.3d at 1357.  This Court is also empowered to provide any relief, including declaratory or injunctive relief, that it deems proper.  28 U.S.C. § 1491(b)(2); *Oak Grove*, 116 F.4th at 1375.  To that end, if necessary, this Court may remand the case back to a governmental agency for further factual findings.  *See* Rule 52.2.

## DISCUSSION

DevTech challenges the contract award to Veritas, arguing that the Agency's actions were arbitrary and capricious and requesting a permanent injunction requiring the Agency to reevaluate all proposals.  To support its challenge, DevTech advances two general lines of argument.  *First*, that Veritas is ineligible for award because its proposal contains material defects, and *second*, that the Agency's evaluation of DevTech's proposal was arbitrary and capricious.  *See generally* DevTech MJAR; Am. Compl.  DevTech's arguments fail on the merits because Veritas's proposal is eligible for award and the Agency appropriately evaluated DevTech's proposal.  Thus, since DevTech's protest fails, it is not entitled to injunctive relief.

## I.   Veritas's Proposal is Eligible for Award.

DevTech first contends that the Agency's award to Veritas is arbitrary and capricious because it failed to find Veritas's proposal ineligible for the award.  Am. Compl. ¶¶ 71–191.  In support of its contention, DevTech advances multiple arguments as to why Veritas is ineligible for award.  *First*, DevTech alleges that Veritas's proposal failed to meet several material Solicitation requirements.  DevTech MJAR at 16–27.  *Second*, DevTech alleges that Veritas's proposal is ineligible because it proposed services not included in Veritas's GSA MAS price list.  *Id.* at 27–

31. DevTech asserts that the Agency's failure to consider these material defects renders the Agency's evaluation arbitrary and capricious. *Id.* at 16. Alternatively, DevTech contends that, to the extent the Agency waived material solicitation requirements for Veritas alone, the Agency implicitly amended the Solicitation. OA Tr. 10:7–11:13; DevTech MJAR at 16. Thus, DevTech contends that the Court should find Veritas's proposal ineligible for award or, alternatively, the Agency should be required to reopen the bidding to allow for DevTech to submit a revised bid under the implicitly amended terms of the Solicitation. OA Tr. 10:7–11:13. After review of the parties' arguments and the Administrative Record, it is clear to the Court that Veritas was eligible for the award and that DevTech's contentions to the contrary lack merit.

"To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." *Centech*, 554 F.3d at 1037–38 (citing *E.W. Bliss Co.*, 77 F.3d at 448). Put another way, "[a] proposal that does not comply with material terms expressed in a solicitation cannot receive an award." *Superior Optical Labs, Inc. v. United States*, 173 Fed. Cl. 243, 254 (2024) (citing *E.W. Bliss*, 77 F.3d at 448).

To evaluate a solicitation, the Court looks to the plain language of the solicitation, guided by the principles governing contract interpretation. *Banknote Corp.*, 365 F.3d at 1353 n.4 (citing *Grumman Data Sys. Corp. v. United States*, 88 F.3d 990, 997–98 (Fed. Cir. 1996)). The Court must take care to interpret the Solicitation "in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.* (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc)).

If the Court finds that an offeror's proposal fails to conform with the requirements of the Solicitation, the next question—whether that missing requirement is material—is a question of law that the Court reviews *de novo*. *Oak Grove*, 116 F.4th at 1379. A "defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired." *Id.* (quoting FAR 14.405); *see also E.W. Bliss*, 77 F.3d at 448–49 ("[W]here a defect in a bid is trivial or a mere formality, not material, the bid is not required to be rejected out of hand." (quoting *M.W. Kellogg Co./Siciliana Appalti Costruzioni v. United States*, 10 Cl. Ct. 17, 26 (1986))).

Conversely, a solicitation requirement is material when it "(1) is express in the solicitation, and (2) serves a 'substantive purpose.'" *Superior Optical*, 173 Fed. Cl. at 254 (quoting *DigiFlight, Inc. v. United States*, 150 Fed. Cl. 650, 657 (2020)). A solicitation requirement serves a "substantive purpose when it is important to the government's evaluation, is binding on the offeror, or has more than a negligible impact on the price, quantity, or quality of the bid." *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 508 (2019) (citing *Bus. Integra, Inc. v. United States*, 116 Fed. Cl. 328, 335 (2014)). "Whether a requirement serves a substantive purpose," and is therefore material, "is for the agency to decide — not [a c]ourt." *Superior Optical*, 173 Fed. Cl. at 254. Indeed, "a court will only overturn an agency's determination that an offeror's bid satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious." *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 505 (2009) (citing *E.W. Bliss Co.*, 77 F.3d at 448).

While interpretation of the Solicitation is a question of law over which this Court exercises *de novo* review, the Court still provides contracting officers "a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded [based on] best

value." *Banknote Corp.*, 365 F.3d at 1353, 1355–56; *see also Garrett Elecs. v. United States*, 163 Fed. Cl. 632, 672 (2023) ("An agency's award decision is 'least vulnerable to challenge when based upon a best value determination.'" (quoting *PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010))). And as noted above, the Court will not wade into "the minutiae of the procurement process in such matters as technical ratings . . . , which involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449; *see also Off. Design*, 951 F.3d at 1373 (noting that second guessing an agency's discretionary determinations "is not the court's role"); *see also Galen Med.*, 369 F.3d at 1339 ("[T]he technical evaluation [is] an inherently judgmental process requiring deference."); *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 130 ("In best value procurements like this one, the [Agency] has substantial discretion in its technical evaluations." (citing *E.W. Bliss*, 77 F.3d at 449)). In sum, the "highly deferential . . . standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman*, 419 U.S. at 285); *see also CeleraPro, LLC v. United States*, 168 Fed. Cl. 408, 430 (2023) ("[I]t is not for the Court to substitute its own judgment for that of the agency. Instead, . . . 'the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009))).

### A.    Veritas's Proposal Conformed to the Requirements of The Solicitation.

DevTech contends that Veritas's proposal is not awardable because it failed to address material requirements of the Solicitation, specifically (i) providing an insufficient technical approach for each of the Optional Tasks, DevTech MJAR at 17–19 (citing AR1654–55); (ii) improperly pricing Optional Tasks 2 and 9, *id.* at 19–21; (iii) insufficiently responding to the

tasks and sub-tasks under Task 11, *id.* at 23–26; and (iv) proposing key personnel under Factor 3 (Key Personnel) with insufficient experience, *id.* at 26–27. Alternatively, DevTech contends that the Agency impermissibly waived these material requirements such that the Agency should be required to amend the Solicitation accordingly and provide DevTech an opportunity to bid on this newly amended solicitation. OA Tr. 10:7–11:13; DevTech MJAR at 16. Each failure, DevTech claims, renders Veritas ineligible for award. However, it is evident to the Court that Veritas's proposal does not suffer from any of the alleged defects. Accordingly, Veritas's proposal was eligible for the award.

### 1. Veritas's Technical Approach Included Sufficient Responses for the Optional Tasks.

DevTech first asserts that Veritas's response to the Optional Tasks failed to meet the Solicitation's material requirements. DevTech MJAR at 17–19, 21. As discussed above, the SOW of the Technical Proposal included twenty tasks, nine of which were considered "optional." AR409–34 (Required Tasks), AR434–38 (Optional Tasks). These tasks were considered optional because they could be exercised at "the request" of the Agency. AR434. The Solicitation required that offerors "fully describe" their technical approach to the tasks, Optional and Required, including "[a] detailed description of the content of each task and subtask" and "[a] discussion of the methodology and workplan to be used for individual tasks or subtasks." AR383. While the Solicitation required offerors to "fully describe" their approach, it emphasized "clarity, relevance and conciseness" including by encouraging offerors to cross-reference rather than repeat information contained in multiple sections and limiting each offeror's Technical Proposal to 30 pages. AR382.

Veritas's proposal responded to the nine Optional Tasks as follows:

### 2.12 Optional Tasking

VMG will employ the diverse approaches presented in section 2.1 in the performance of optional tasks as they are assigned by the COR. However, given the limited details contained in the SOW on the potential magnitude and complexity of these various tasks and activities, it was very challenging to estimate the precise type of resources and level of effort that could potentially be required to complete such broad-based tasks/activities on a firm fixed price basis. To manage the high risk associated with such potential variability in scope, complexity, and level of effort, we have based our estimates on the average "medium" level of complexity and magnitude on a not-to-exceed fixed price basis.

AR1653–54. According to DevTech, this response is inadequate because it failed to "address any of the Factor 1 requirements with respect to the optional tasks" constitutes a "confess[ion] that [Veritas] did not understand what any of the nine Optional Tasks entail." DevTech MJAR at 18. DevTech contends that the paragraph fails to meet material solicitation requirements because it fails to respond to each task individually and does not fully describe Veritas's technical approach to any of the Optional Tasks. *Id.* at 18–19, 21.

The Agency counters that Veritas's response was sufficient and that, in any event, the Optional Tasks were not material based on the plain text of the Solicitation. Agency Resp. MJAR at 11–13; OA Tr. 81:7–84:20; *see also* Agency MJAR at 27 (quoting AR434). The Agency contends that Veritas's reference to "section 2.1" in its proposal was consistent with the Solicitation's instructions (i) that "[w]here data/information appears in one part, it does not have to be repeated in any other part," and (ii) to include a "discussion of anticipated major problem areas, together with potential approaches for their solutions." AR382–83; Agency MJAR at 28 (first quoting AR382; and then quoting AR1653); Agency Resp. MJAR at 12 (quoting AR382); OA Tr. 68:4–70:14 ("[T]he instructions are basically inviting what VMG is doing here."). Veritas similarly argues that it properly addressed the Optional Tasks, albeit "through a high-level discussion that referenced its more in-depth analysis of the non-optional tasks." Veritas MJAR at 14–15. Veritas also contends that the only offerors who received significant weaknesses for the

Optional Tasks were the two offerors who wholly failed to address the Optional Tasks. Accordingly, Veritas asserts that it would be "unreasonable" to be rated similarly or lower than offerors who failed to address the Optional Tasks at all. *Id.* at 16 (first citing AR2081 ███; and then citing AR2085 ██████████); *see also* AR2081 ("The offeror did not include any description or discussion to address Optional Tasks."); AR2085 (same).

Veritas adequately responded to the Optional Tasks. Veritas's response was consistent with the terms of the Solicitation, and the Agency's conclusion that Veritas sufficiently responded was rational. The Court assesses Veritas's response in light of the Solicitation's encouragement to refrain from submitting lengthy answers to the Technical Proposal. *See* AR382. Specifically, the Solicitation (i) notes that "[t]he clarity, relevance and conciseness of the task order proposal is important, not the length," *id.*; (ii) encourages offerors to cross-reference repeated information, *id.*; and (iii) limits the length of the Technical Proposal to 30 pages, *id.* Thus, Veritas's response to the Optional Tasks, though brief, was sufficient because, consistent with the Solicitation's instructions, Veritas cross-referenced to another section that contained a substantive response, thereby incorporating that response. AR1653–54; *see* AR382.

DevTech contends that the cross reference in Veritas's Technical Proposal, which totals 21 pages, was too vague. *See* DevTech Resp. MJAR at 7–8; DevTech MJAR at 17–18; *see* OA Tr. 124:12–25 (discussing Veritas's cross-reference as encompassing the entire 21 pages of Veritas's Technical Proposal addressing all eleven Required Tasks). Veritas's cross reference back to the main portion of its proposal contained sufficient information for the Agency to evaluate the Optional Tasks, particularly given that multiple Optional and Required Tasks served the same or overlapping purposes. Agency MJAR at 28. Indeed, four of the nine Optional Tasks fully overlap in purpose with the Required Tasks. *Id.*; *compare, e.g.*, AR423–24 (Task 8: Special Projects), *with*

24

AR435–36 (Optional Task 3: Special Projects); AR414–15 (Task 5: Continuous Learning Resources), *with* AR434 (Optional Task 1: Orientation, Trainings, and Learning Sessions); AR417–20 (Task 6: Serve as ISME in Comprehensive, Diagnostic and Technical Assistance Site Visits), *with* AR434-35 (Optional Task 2: Site Visits, including Comprehensive, Technical Assistance, and Diagnostic Site Visits). This overlap, while not complete, undercuts DevTech's assertion that Veritas "does not address any of the Factor 1 requirements with respect to the optional tasks." DevTech MJAR at 18. In sum, Veritas's approach, though short and high-level, was a sufficient response given the cross-reference to another substantive section response and the overlap between the Optional Tasks and Required Tasks. It was also consistent with the Solicitation's instruction that "[t]he clarity, relevance, and conciseness of the task order proposal is important, not the length." AR382; AR1653–54.

DevTech also asserts that the "Agency's evaluation failed to notice" this alleged error. DevTech MJAR at 25. The Administrative Record, however, shows otherwise. Indeed, one of the Agency's individual reviewers initially assigned Veritas a weakness for its Optional Tasks, noting that the Optional Tasks were "covered in a short paragraph and refer[] back to main tasks." AR2040. Ultimately, the TEP met and came to a consensus to award Veritas no weaknesses or strengths for its Optional Tasks in the Agency's Consolidated Evaluation Report. AR1832; AR1834; AR2097–98. This is consistent with how the Agency evaluated other proposals.[7] *See,*

---

[7] For example, offerors other than Veritas received no strengths or weaknesses for the Optional Tasks in the Agency's Consolidated Evaluation Report. AR2071–72 (DevTech); AR2088–89 (ProScopeo); AR2093–94 (Rumph and Associates). Offerors who "excluded any description or discussion" of Optional Tasks were assessed only significant weaknesses, not deficiencies. AR2076 (G2S); AR2080–81 (IMS); 2083–85 (Links Media); *see also* AR392 (defining deficiency as a "material failure of a proposal to meet a Government requirement . . . that increases the risk of unsuccessful contract performance to an unacceptable level"). Thus, the Agency's evaluation of the other proposals is squarely at odds DevTech's assertion that Veritas should be considered ineligible based on its response to the Optional Tasks. *See* DevTech MJAR at 17–19.

*e.g.*, AR2071–72; AR2076; AR2080–81; 2083–85; AR2088–89; AR2093–94. Thus, the record reflects that the Agency considered Veritas's short response and found it to be sufficient. *See Advanced Data*, 216 F.3d at 1058 (noting that the "highly deferential" arbitrary and capricious "standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman*, 419 U.S. at 285)); *Impresa*, 238 F.3d at 1338 (noting that agency actions are "entitled to a presumption of regularity.").

Finally, the Optional Tasks are part of the Agency's technical evaluation. AR382–83; AR2039–40. Thus, the Agency's determinations regarding the Optional Tasks are entitled to deference. *Off. Design*, 951 F.3d at 1373; *see also Galen Med.*, 369 F.3d at 1339 ("[T]he technical evaluation [is] an inherently judgmental process requiring deference."); *Blackwater Lodge*, 86 Fed. Cl. at 505 ("[A] court will only overturn an agency's determination that an offeror's bid satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious." (citing *E.W. Bliss Co.*, 77 F.3d at 448)).

In sum, DevTech cannot carry its heavy burden to demonstrate that the Agency's decision was arbitrary and capricious here. *Centech*, 554 F.3d at 1037. This is because Veritas's response, while short, was sufficient in light of the Solicitation's directions and the overlapping nature of many of the Optional and Required Tasks. Accordingly, the Agency's ultimate determination— which is afforded great deference—was not arbitrary and capricious. *Off. Design*, 951 F.3d at 1373; *see also E.W. Bliss*, 77 F.3d at 449 (noting that the court "will not second guess" the "minutiae of the procurement process in such matters as technical ratings . . . , which involve discretionary determinations of procurement officials").

### 2. Veritas Did Not Improperly Price Optional Tasks 2 and 9.

DevTech next contends that Veritas (i) priced improper quantities of the Optional Tasks and (ii) improperly reserved the right to renegotiate the overall cost after award. *See* DevTech

MJAR at 19–21; DevTech Resp. MJAR at 10–13.  These arguments lack merit.  As described below, Veritas's pricing for Optional Tasks 2 and 9 was proper, and the Agency fully considered the response.  Further, to the extent Veritas's response to the Solicitation could somehow be considered impermissible, DevTech waived its ability to bring such a claim, which would have resulted from a patent ambiguity in the Solicitation.  *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  Nor does the record reflect that Veritas reserved the right to reprice its costs after award, as DevTech contends; in contrast the record reflects that Veritas is bound to its pricing as bid.

> a)  **Veritas's Pricing of the Optional Tasks was Proper; Alternatively, DevTech Waived This Argument Under *Blue & Gold*.**

As noted, the SOW included a "Payment Schedule," for offerors to build their price proposals for the Base Period and each Option Period.  AR444–45; AR297 (indicating that "[o]fferors will use the payment schedule in the SOW to build their price propos[a]l" in response to a question about the price proposal).  The Tasks Section, however, included a different quantity of deliverables for Optional Tasks 2 and 9 than the Payment Schedule included.  *Compare* AR434–38, *with* AR444–51.

| Optional Task | Quantity Listed in Tasks Section for Base Period | Quantity Listed in Payment Schedule for Base Period |
|---|---|---|
| **Comprehensive Site Visits** | 2 | 10 |
| **Technical Assistance Site Visits** | 2 | 22 |
| **Diagnostic Site Visits** | 3 | 9 |
| **Analytical Projects** | 0 | 3 |

AR434; AR438; AR445.

The chart above reflects the differences in the quantity of Optional Tasks listed in (i) the Payment Schedule and (ii) the Tasks Section. For example, while the Tasks Section provides that Comprehensive Site Visits "[could] be exercised . . . [u]p to Two (2) times (one per implementing partner)," the Payment Schedule provides for ten Comprehensive Site Visits. *Compare* AR434, *with* AR445. Similar discrepancies appear for other site visits under Optional Task 2, including Technical Assistance Site Visits and Diagnostic Site Visits. *Compare* AR434 (noting that Technical Assistance Site Visits "can be exercised . . . Up to Two(2) [sic] times (one per country)"), *with* AR445 (listing quantity as "22" under Technical Assistance Site Visit in Payment Schedule); *compare* AR434 (noting that Diagnostic Site Visit "can be exercised . . . Up to Three (3) times [] (one per region)"), *with* AR445 (listing quantity as "9" under Diagnostic Site Visit in Payment Schedule).

Further, for Optional Task 9, Analytical Projects, the Tasks Section provides that the analytical projects "[c]an be exercised three (3) times each," but only "during the Option Period One and Option Period Two." AR438 (emphasis omitted). Thus, under the Tasks Section, the Agency could not exercise Optional Task 9 during the Base Period or Option Periods Three and Four. *Id.* While the Payment Schedule also lists the quantity of analytical projects as three, it includes three analytical projects during each of the Base and Option Periods. AR444–51. This plainly conflicts with the Tasks Section, which limits exercising of Optional Task 9, analytical projects, to only "during the Option Period One and Option Period Two," not during the Base Period or Option Periods Three and Four. AR438 (emphasis omitted).

Before the deadline to submit bids, one prospective offeror submitted a question to the Agency regarding the Payment Schedule. The prospective offeror asked:

> Volume III. 3 Price Proposal Instructions, Section (c) says "Offeror shall propose a payment schedule with unit prices and to[t]al pricing": A payment Schedule is

provided in Attachment B - pages 35-40[.]  Shouldln't [sic] this Table be used by offerors to build the Paynment [sic] schedule? Are [] we expected to provide our own payment proposal?

AR297.  In response, the Agency answered that "[o]fferors will use the payment schedule in the SOW to build their price propos[a]l."  *Id.*

In its proposal, Veritas used the quantities listed in the Tasks Section, not the Payment Schedule.  AR1737–46.  Thus, as illustrated in the chart below, Veritas only priced two technical assistance and comprehensive site visits, three diagnostic site visits, and no analytical projects for the Base Period.  AR1738.

| Optional Task | Quantity Listed in Tasks Section for Base Period | Quantity Listed in Payment Schedule for Base Period | Quantity Priced by Veritas for Base Period |
|---|---|---|---|
| Comprehensive Site Visits | 2 | 10 | 2 |
| Technical Assistance Site Visits | 2 | 22 | 2 |
| Diagnostic Site Visits | 3 | 9 | 3 |
| Analytical Projects | 0 | 3 | 0 |

AR434–38, AR444–51; AR1737–38.  Veritas was the only offeror that priced these Optional Tasks using the quantity included in the Tasks Section rather than the Payment Schedule.  OA Tr. 15:3–6, 77:13–17.

DevTech contends that Veritas's failure to price the quantities provided in the Payment Schedule constituted a disqualifying failure to meet a material solicitation requirement and "created a false and unfair price comparison" between Veritas and DevTech's proposals.  DevTech MJAR at 17, 19, 21.  The Agency asserts that it identified and considered Veritas's pricing assumptions and that nothing in the record demonstrates that it took issue with those assumptions.  Agency MJAR at 29–30.  Veritas responds that it provided an approach "based on a reasonable

reading of the Solicitation," which "brought two competing portions of the SOW into agreement" by complying with the plain language of the Tasks Section and its pricing assumptions.  Veritas MJAR at 17–21; AR434; AR438.

A review of the record reflects that the Agency did not act arbitrarily and capriciously; it fully considered Veritas's responses to the Optional Task pricing and found them sufficient.  To begin, the record reflects multiple instances where the Agency fully considered Veritas's responses and still found them sufficient.  For example, a native Excel file generated by the Agency during its technical evaluation, the "Technical Evaluation Panel Review – Business," demonstrates that the Agency recognized that Veritas priced a different quantity of site visits under Optional Task 2.  AR Tab 40a (sheet: Cost Deliverables, cells S23–25);[8] Index to the Corrected Administrative Record (ECF No. 25-2); *see* OA Tr. 78:11–79:22.  The formulas in these cells reflect that the TEP calculated the unit price for Veritas using the number of visits that Veritas priced based on the Tasks Section rather than the quantity included in the Payment Schedule, which were reproduced in column D of the same sheet, as the TEP did for other offerors like Devtech.  AR Tab 40a (dividing Veritas's overall price for the Optional Task 2 site visits, cells T23–25, by the quantities included in the Tasks Section (two or three visits) rather than the quantities included in the Payment Schedule, to produce accurate unit pricing in cells S23–25); *see also id.* (sheet: Cost Deliverables, cells G23–25) (illustrating that unit price for DevTech was calculated by dividing the total price in cells H23–25 by the quantities included in cells D23–25, which match the quantities included in the Payment Schedule).  Indeed, in AR Tab 40a, Veritas's unit prices for the three site visits as part of Optional Task 2 are marked in red.  AR Tab 40a (sheet: Cost Deliverables, cells S23–25);

---

[8] As AR Tab 40a appears to be a duplicate of AR Tab 28, the Court only references AR Tab 40a.

OA Tr. 79:10–22 (Agency counsel explaining that "a logical inference" of the red text "is noting that the quantities being proposed by this offeror are not a mirror image with the payment schedule").

AR Tab 40a illustrates that the Agency recognized that Veritas priced a different quantity of Optional Tasks 2 and 9 than other offerors and revised its internal review to reflect the proper unit costs. By doing so, the Agency compared apples to apples, considering Veritas's unit pricing against the unit pricing of other offerors regardless of the quantity proposed. AR Tab 40a. Further, one of the individual TEP members specifically noted that Veritas did not price Optional Task 9 for the Base Period. AR2151 ("There should be a Unit and Total Costs for Optional Task 9 (Analytical Projects), which is listed as $0."). The Agency also noted in the Award Summary that all cost proposals "were evaluated by the TEP members as well for level of effort and appropriateness." AR2388. Thus, the record demonstrates that the Agency appropriately reviewed Veritas's pricing proposal, recognized its pricing approach, and found no issue with Veritas's pricing of Optional Tasks 2 and 9 even when that pricing was based on the quantity included in the Tasks Section, not the Payment Schedule. *See Advanced Data*, 216 F.3d at 1058 (noting that the "highly deferential" arbitrary and capricious "standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman*, 419 U.S. at 285)).

The Agency's acceptance was reasonable as the contract at issue is a firm-fixed price contract. AR405. Indeed, Veritas must stand by the prices it proposed, even if its pricing assumptions are incorrect. *See* Veritas Resp. MJAR at 3 ("V[eritas's] pricing assumption makes clear that it established a ceiling on its proposed price, such that even if [it] were incorrect regarding quantity, the total price proposed is the total price to which [it] committed."). At oral

31

argument, counsel for both the Agency and Veritas confirmed that Veritas could not amend its Optional Task pricing.  OA Tr. 70:15–20, 117:15–18, 131:13–132:15.

In sum, given that the Agency sufficiently considered the quantity of Optional Tasks proposed by Veritas along with the firm-fixed price nature of the contract, coupled with the Agency's presumption of regularity and DevTech's heavy burden, the Court cannot conclude that the Agency acted arbitrarily or capriciously in accepting Veritas's pricing assumptions.  *See DynCorp Int'l*, 10 F.4th at 1312–13 (quoting *Impresa*, 238 F.3d at 1337); *Off. Design*, 951 F.3d at 1373; *Centech*, 554 F.3d at 1037; *Impresa*, 238 F.3d at 1338.

Even if Veritas's reading of the SOW was somehow an impermissible reading of the Solicitation, DevTech waived this argument under *Blue & Gold* by failing to raise it before the close of bidding.  *See Blue & Gold*, 492 F.3d at 1313.  This is because any conflict between the amount of Optional Tasks listed in the Tasks Section versus the Payment Schedule is an obvious and significant inconsistency.

"A defect in a solicitation is patent if it is an obvious omission, inconsistency, or discrepancy of significance . . . [that] could have been discovered by reasonable and customary care."  *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020).  A solicitation provision "is ambiguous only if its language is susceptible to more than one reasonable interpretation."  *Banknote Corp.*, 365 F.3d at 1353 (citing *Grumman Data Sys.*, 88 F.3d at 997).  In the post-award bid protest context, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  *Blue & Gold*, 492 F.3d at 1313.  This is so even where "a challenge to the terms of the solicitation" is "characterize[d] . . . as a challenge to the evaluation of [an

awardee's] proposal." *Id.* Accordingly, if a Solicitation provision is ambiguous and that ambiguity was clear before the close of bidding, the protestor may not advance arguments based on that ambiguity. *Id.*

While Agency counsel equivocated whether there was a *Blue & Gold* issue related to the discrepancies in quantities between the Tasks Section and Payment Schedule, Veritas advanced a *Blue & Gold* argument. *See* OA Tr. 71:22–77:11, 114:4–115:6; Veritas MJAR at 17–21. The quantity in the Tasks Section and the Payment Schedule plainly conflict as they offer different quantities. *Blue & Gold*, 492 F.3d at 1313; *compare* AR434–38, *with* AR444–51. DevTech argued in its responsive MJAR and at oral argument that the number in the Tasks Section "state[s] how frequently the Agency can exercise optional tasks," while the Payment Schedule lists "the quantity of each task per exercised option." DevTech Resp. MJAR at 13 (emphasis omitted); OA Tr. 12:16–15:21. Even if true, this does not resolve the conflict between the Tasks Section and the Payment Schedule. For example, with Optional Task 9, the SOW plainly states that Analytical Projects can be exercised three times during Option Periods One and Two only. AR438. Thus, even under DevTech's proposed reading of the SOW, the Agency would be unable to exercise Analytical Projects during the Base Period and Option Periods Three and Four. *Id.* Yet, the Payment Schedule still includes three Analytical Projects during those years, directly conflicting with the Tasks Section requirements and DevTech's argument. AR438; AR445; AR449; AR451; DevTech Resp. MJAR at 13. Thus, the inconsistency "could have been discovered by reasonable and customary care." *Inserso*, 961 F.3d at 1349. Even if a "cautious offeror" would not have used the quantities included in the Tasks Section or the contracting officer did not see the ambiguity does not bear on the fact that the inconsistency could have been discovered by reasonable care. OA Tr. 76:14–16; *Inserso*, 961 F.3d at 1349. Thus, because the conflict between the quantity in

the Tasks Section and the Payment Schedule was apparent from a facial review of the SOW,

DevTech waived this argument under *Blue & Gold* when it failed to challenge this patent

ambiguity pre-award.  492 F.3d at 1313; *compare* AR434–38, *with* AR444–51.

> **b)    Veritas Did Not Reserve the Right to Reprice the Optional Tasks Later.**

In addition to challenging the pricing quantities on which Veritas based its proposal,

DevTech asserts that Veritas's pricing illustrates Veritas's expectation that it would be able to

reprice its proposal later, violating the Solicitation's firm, fixed price requirement.  DevTech

MJAR at 22 (citing AR396).  DevTech bases this assertion on Veritas's language in its price

proposal, which notes that:

> VMG's estimate of cost for this project is based on a **not-to-exceed** Firm Fixed Price (FFP) Contract Line Item (CLIN) structure.  VMG staff will work with HRSA counterparts to accomplish tasks and deliverables according to the established project schedule, priorities and budgets.  Given the limited details on some task/activities contained in the HRSA SOW with respect to the potential magnitude and complexity of various tasks and activities (especially Tasks 5, 7 and 8) it was very challenging to estimate the precise type of resources and level of effort that could potentially be required to complete such broad-based tasks/activities on a firm fixed price basis.  To manage the high risk, on a firm fixed price contract, associated with such potential variability in scope, complexity, and level of effort, we have based our estimates on the average "medium" level of complexity and magnitude, on a **not-to-exceed** fixed price basis.  VMG will work cooperatively with the HRSA COR and key stakeholders to establish greater clarity around scope, determine priorities and ensure alignment of HRSA objectives, timelines and budget resources with maximum flexibility to make any necessary adjustments to ensure project success and customer satisfaction.

AR1735 (emphasis in original).  Specifically, DevTech reads the line that Veritas "will work

cooperatively with the [Agency] and key stakeholders to establish greater clarity around scope . . .

and budget resources with maximum flexibility to make any necessary adjustments" as a

reservation of Veritas's right to reprice these tasks later.  DevTech MJAR at 21–23.

The Court concludes that Veritas did not reserve any right to amend its price later.  Rather, Veritas simply recognized uncertainty as to which Optional Tasks would be exercised.[9]  Veritas MJAR at 20.  Veritas's conclusion is supported by its own proposal, which plainly acknowledges the firm-fixed price nature of the Solicitation.  For example, the excerpt above directly acknowledged that Veritas's cost estimate is for a fixed price contract four times in the same paragraph.  AR1735.  This reflects that Veritas understood the nature of the contract and committed to not altering its prices.  *Id.*  Further supporting this conclusion, at oral argument the Agency and Veritas both acknowledged that Veritas could not amend its unit pricing as proposed.  OA Tr. 70:15–20, 117:15–18, 131:13–132:15.

Finally, *Harmonia*, another case from this Court, is instructive.  *See Harmonia Holdings Grp., LLC v. United States*, 136 Fed. Cl. 298 (2018).  In *Harmonia*, the protestor alleged that the awardee's inclusion of certain assumptions in its price quotation indicated that the awardee "reserved . . . the right to a price adjustment any time it encounters anything . . . not specifically identified in the statement of work."  *Id.* at 312 (cleaned up).  Those assumptions were that "the government will provide [awardee] timely access to facilities required for the completion of the work aligned with this contract," and "the government will provide [awardee] timely access to staff and subject matter experts . . . required for the completion of the work assigned during this contract."  *Id.* (cleaned up).  The *Harmonia* court, however, rejected this assertion, concluding that

---

[9] At most, the language may be suggestive that Veritas could later seek an equitable adjustment of its pricing.  At oral argument, Veritas's counsel acknowledged that the contracting officer could deny any request for equitable adjustment, and DevTech does not point to any requirement in the Solicitation stating that such a statement disqualifies a proposal.  As Veritas confirmed its unit price for each Optional Task was not subject to change, whether an equitable adjustment would occur is a question for contract administration, not a bid protest, and accordingly weighs against DevTech.  OA Tr. 117:15–18, 131:13–132:15.

the awardee's "assumptions are [nothing] more than an illustration that [the awardee] understood the solicitation's requirements and the scope of work." *Id.* (cleaned up). Here, like in *Harmonia*, nothing in Veritas's proposal reserves the right for the awardee to amend its firm-fixed pricing quote later. *Id.*; AR1734–35. Rather, Veritas's assumptions simply indicate that it fully appreciated the Solicitation's requirements.

### 3. The Agency Rationally Concluded that Veritas's Response to Task 11 Was a Weakness.

DevTech asserts that Veritas failed to adequately respond to the many subtasks and sub-subtasks under Task 11, Basic Security Requirements. DevTech MJAR 23–26. The Court finds that the Agency properly considered Veritas's response and rationally awarded Veritas a weakness after finding its proposal was partially responsive. Even if Veritas's responses were not sufficient, Task 11 is not material, and DevTech cannot establish prejudice because DevTech's responses to Task 11 suffer from similar issues.

### a) Veritas's Response to Task 11 was Sufficient.

Task 11 contains thirteen subtasks and even more sub-subtasks. AR427–39. Veritas responded to Task 11 in its Solicitation as follows:

> VMG Is familiar with the security requirements under Task 11 from our work with HRSA, CDC, CMS FDA, and other federal agencies. We will ensure full compliance with all security requirements, effectively safeguarding government information and maintaining high-security standards throughout the contract duration. This is accomplished using internal contract, program, and project management practices, procedures and robust processes managed within our PMO.

AR1653. As discussed above, the Solicitation required that offerors "fully describe" their technical approach, including "[a] detailed description of the content of each task and subtask." AR383. Based on Veritas's response, quoted above, the Agency assigned Veritas a weakness, noting that the response "[o]nly partially covered the security components with a few sentences when covering general compliance with all the related tasks." AR2098. The Agency's TEP

Review Checklist notes that Veritas responded to Task 11 overall, but for each subtask and sub-subtask, the TEP marked that Veritas only provided a "Partial" response. AR Tab 40a (sheet: Tech Reqs, cells R49–80).

DevTech argues that (i) the Agency improperly downplayed the significance of Veritas's failure to meet the Solicitation's requirements by only assigning a weakness when, in its view, Veritas's response was entirely non-responsive, and (ii) the Agency's finding that Veritas had responded to some of the subtasks is contrary to the Solicitation because Veritas failed to comply with its requirements. DevTech MJAR at 25–26. The Agency responds that it is not the Court's job to second-guess the Agency's discretionary determinations, particularly those regarding technical evaluations. Agency MJAR at 30–31 (citing *Off. Design*, 951 F.3d at 1373). Veritas advances a similar argument and further notes that (i) even with this weakness, Veritas's strengths "far outweigh[ed]" the weaknesses assessed under Task 11, and (ii) the Agency's assignment of a weakness is consistent with how it rated similar descriptions from other offerors. Veritas MJAR 21–23 (first quoting AR2097–98; then citing AR2066; then citing AR2076; and then citing AR2089).

The Court will not second guess the Agency's discretionary determinations, particularly where the record shows that the Agency fully considered Veritas's response. *See Advanced Data*, 216 F.3d at 1058 (noting that the "highly deferential" arbitrary and capricious "standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman*, 419 U.S. at 285)). "It goes without saying that an agency has 'great discretion in determining the scope of an evaluation factor.'" *Elec. Data Sys., LLC v. United States*, 93 Fed. Cl. 416, 430 (2010) (quoting *Forestry Surveys & Data v. United States*, 44 Fed. Cl. 493, 499 (1999)); *Galen Med.*, 369 F.3d at 1339 ("[T]he technical evaluation [is] an inherently

judgmental process requiring deference."). As the Federal Circuit has made very clear, it is not the job of the Court to second guess an Agency's discretionary determination. *Off. Design*, 951 F.3d at 1373; *E.W. Bliss*, 77 F.3d at 449 (noting that "a court will not second guess" certain matters, such as "technical ratings . . . , which involve discretionary determinations of procurement officials"). Further, it would be improper for the Court to substitute its own judgment for that of the Agency. *Harmonia Holdings*, 999 F.3d at 1408 (noting that the Court's "role in reviewing procurement decisions, . . . is not to evaluate the offerors' proposals anew or to substitute [its] judgment for that of the agency"); *Honeywell*, 870 F.2d at 648 ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.").

The Agency fully considered Veritas's response, concluded that the responses were sufficient, and awarded Veritas a weakness. *See* AR2097–98; AR Tab 40a (sheet: Tech Reqs, cells R49–80). In reaching its consensus in the Agency's Consolidated Evaluation Report, one reviewer awarded Veritas a significant weakness for Task 11 in their individual evaluation. AR2040. As explained above, each offeror's Technical Proposals were first reviewed individually by each member of the TEP. AR1834–35. After each TEP member individually assigned ratings to an offeror's proposal, the TEP was required to meet collectively for a "consensus meeting" to discuss each proposal and "reconcile differences" between the TEP member's evaluations. AR1834. The TEP members then consolidated their findings into the Agency's Consolidated Evaluation Report. AR2063–2100. After discussing, reconciling, and consolidating their individual ratings, the TEP jointly assessed Veritas's response to Task 11 a weakness, noting that it "[o]nly partially covered the security components with a few sentences when covering general compliance with all related

tasks." AR2098. It is clear that the Agency's TEP thoroughly considered the responsiveness of Veritas's response to Task 11—including its brevity—and came to the consensus of awarding it a weakness. *See id.*; *see also Advanced Data*, 216 F.3d at 1058 (noting that the "highly deferential" arbitrary and capricious "standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman*, 419 U.S. at 285)). Because the Agency rationally concluded that Veritas's responses warranted only a weakness, the Court will not wade into the minutiae of the evaluation of a technical proposal. *Off. Design*, 951 F.3d at 1373; *E.W. Bliss*, 77 F.3d at 449 (noting that "a court will not second guess" certain matters, such as "technical ratings . . . , which involve discretionary determinations of procurement officials").

### b) Task 11 is an Immaterial Requirement.

Even if DevTech could establish that Veritas's response to Task 11 was insufficient, it cannot show that each subtask of Task 11 was material. A "defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired." *Oak Grove*, 116 F.4th at 1379 (quoting FAR 14.405). Indeed, for a term to be material, it must serve a substantive purpose. *Superior Optical*, 173 Fed. Cl. at 254 (quoting *DigiFlight*, 150 Fed. Cl. at 657); *see ManTech Advanced*, 141 Fed. Cl. at 508 (quoting *Bus. Integra*, 116 Fed. Cl. at 335). "Whether a requirement serves a substantive purpose, though, is for the agency to decide — not this Court." *Superior Optical*, 173 Fed. Cl. at 254.

The Agency's independent government cost estimate (IGCE), included in AR Tab 41, illustrates that Task 11 is not material. AR Tab 41 (sheet: IGCE). The Agency estimated that personnel from each labor category included in the Solicitation would only spend four total hours on Task 11 in the Base Period. *Id.* Those four hours pale in comparison to the overall estimated

1,761 hours that the Agency expected the Research Analyst/Advisor (RAA) and TA Specialist/Research Analyst (TA/RA) positions to spend on the project in the Base Period.  *Id.* This means that the Agency estimated the RAA and TA/RA positions spending 0.2% of their time on Task 11's security tasks.  Similarly, the Agency estimated that the Project Manager and Project Assistant would respectively spend 760 and 710 hours on the project during the Base Period,  but still only estimated those roles spending four hours on Task 11.  *Id.*  This is roughly 0.5% of the total estimated hours personnel in these positions would spend on the entire project during the Base Period.  Beyond the Base Period, the IGCE maintained the same four-hour estimate for all roles in Option Periods One and Two along with similar overall time estimates for the roles.  *Id.* The IGCE did not provide estimates for Base Periods Three and Four.  *Id.*  Further, Task 11 had the fewest allocated hours of any other task, illustrating that it was immaterial.  *See id.*

The hours the Agency allocated to Task 11 in the IGCE undermines DevTech's contention that Task 11 is material.  *See* DevTech MJAR at 23–26.  The limited number of hours that the Agency expected contractors to spend on Task 11 indicates that the Agency did not think it served a substantive purpose. *See Superior Optical*, 173 Fed. Cl. at 254 ("Whether a requirement serves a substantive purpose, though, is for the agency to decide — not this Court.").  Given the minor, estimated percentages of time that the Agency thought personnel would spend on Task 11—less than any other task—the effect of Task 11 "is negligible when contrasted with the total cost or scope of the supplies or services being acquired."  *Oak Grove*, 116 F.4th at 1379 (quoting FAR 14.405); AR Tab 41 (sheet: IGCE).

Consistent with the miniscule time that the Agency estimated contractors would spend on Task 11, the tasks and subtasks described in Task 11 do not appear to be substantive or material

tasks.  Certain subtasks appear so non-substantive that formulating an appropriate response would be difficult.  For example:

- Task 11, subtask 1.a: "Access (Physical or Logical) to Government Information: A Contractor (and/or any subcontractor) employee will have or will be given the ability to have, routine physical (entry) or logical (electronic) access to government information."  AR427.

- Task 11, subtask 1.b: "Operate a Federal System Containing Information: A Contractor (and/or any subcontractor) will operate a federal system and information technology containing data that supports the HHS mission.  In addition to the Federal Acquisition Regulation (FAR) Subpart 2.1 definition of "information technology" (IT), the term as used in this section includes computers, ancillary equipment (including imaging peripherals, input, output, and storage devices necessary for security and surveillance), peripheral equipment designed to be controlled by the central processing unit of a computer, software, firmware and similar procedures, services (including support services), and related resources."  AR428.

- Task 11, subtask 13: "The Government will provide laptops.  A total of ten (10) laptops will be issued to the contractor and will be tracked with SOW Attachment A.  The Government will pay for shipping of laptops to the contractor and the contractor shall pay for shipping of laptops to return to the Government."  AR433–34.

When asked at oral argument what would be a sufficient response to some of these general subtasks, DevTech's counsel could not provide a specific answer.  OA Tr. 44:15–46:7.  Instead, he noted that the Court "identified [a subtask] that may not be as material as others."  *Id.* at 45:23–46:7.  The non-substantive nature of these subtasks supports a finding that they are not material because they are "negligible when contrasted with the total . . . scope" of the Solicitation.  *Oak Grove*, 116 F.4th at 1379 (quoting FAR 14.405); *see also E.W. Bliss*, 77 F.3d at 448–49 ("[W]here a defect in a bid is trivial or a mere formality, not material, the bid is not required to be rejected out of hand." (quoting *M.W. Kellogg*, 10 Cl. Ct. at 26)).

### c)    DevTech Cannot Establish Prejudice Related to Task 11.

Even if Task 11 was a material solicitation requirement and DevTech could establish that Veritas failed to respond to it, DevTech cannot establish prejudice because DevTech's own

responses to Task 11 would also be insufficient. *See* AR665–67. DevTech contends that merely acknowledging that a task is required does not satisfy—fully or partially—the requirements of the Solicitation. DevTech MJAR at 25. But DevTech's own responses to Task 11 do exactly that. For example, under subtask 1, "Applicability," which is reproduced above, the Solicitation included two subtasks, "Access (Physical or Logical) to Government Information" and "Operate a Federal System Containing Information." AR427–28. In response to these two subtasks, DevTech noted that ████████████████████████████████████████████

████████████████████████████████████████████

████████ AR665. DevTech's responses to other tasks are similarly short and rife with generalities. *See* AR665–67 (DevTech response to Task 11); *compare* AR428 (requirements for subtask 2 with four sub-subtasks and three sub-sub-subtasks), *with* AR665 ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ ; *see also* Veritas Resp. MJAR at 4 ("DevTech's proposal for Task 11 is long on words and short on substance."). Thus, DevTech cannot establish prejudice because, to the extent the Agency committed error by accepting what Veritas contends is an insufficient response, DevTech benefitted from the same error. *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 606 (2023); *see also G4S Secure Integration LLC v. United States*, No. 21-1817C, 2022 WL 211023, at *8 (Fed. Cl. Jan. 24, 2022) ("There has been no prejudice when a bid protestor benefited from the same potentially unlawful discretion from which the awardee benefited."), *appeal dismissed*, No. 22-1513, 2023 WL 316142 (Fed. Cir. Jan. 19, 2023); *VS2, LLC v. United States*, 155 Fed. Cl. 738, 768 (2021) ("[Protestor]

cannot now complain about [awardee and agency's] interpretation of the Solicitation when [protestor] relied upon the very same interpretation when preparing its proposal.").

### 4. DevTech's Arguments Related to Veritas's Proposed Project Manager Fail.

DevTech next asserts that the Agency erred by assigning Veritas a strength under Factor 3, Key Personnel, because Veritas's proposed project manager purportedly lacks the experience required by the Solicitation. DevTech MJAR at 26–27. The Solicitation required a "Project Manager" with "[e]ight years general experience [and] 6 years project management experience." AR385. Veritas proposed Jennifer C. Peters for the position. AR1660; *see* AR1666–69 (Ms. Peters's resume). Ms. Peters has over 25 years of experience in public health—including with PEPFAR—in 22 countries and has "led or participated in more than ten USAID evaluations." AR1666. DevTech's lone challenge to Ms. Peters's qualifications is that, despite her 25 years of experience, she lacks six years of project management experience. DevTech Resp. MJAR at 18.

The Court finds that Veritas's proposed project manager met the minimum qualifications required by the Solicitation. Further, even if the Agency erred in its determination that Veritas's project manager was qualified, DevTech cannot establish prejudice because its proposed project manager suffers from the same purported deficiencies—if not more—that DevTech argues renders Veritas's project manager unqualified.

### a) The Agency Rationally Concluded that Veritas's Project Manager was Qualified.

Veritas's proposed project manager meets the Solicitation's requirements. DevTech only challenges whether Ms. Peters has the requisite six years of project management experience. AR385; DevTech Resp. MJAR at 18. DevTech contends that Ms. Peters's resume "does not show any project management experience." DevTech MJAR at 26–27; Sur-Reply at 2–3. The Agency and Veritas disagree with DevTech's characterization and contend that the Court should not second

guess the Agency's discretionary judgment in its review of technical proposals. Agency MJAR at 31; Veritas MJAR at 24, 26. Indeed, DevTech's own Sur-Reply seems to agree that the Court should not disturb the Agency's determination concerning whether a project manager has the requisite experience. *See* Sur-Reply at 3 ("This is also not an area where the agency reasonably could exercise discretion—i.e., where reasonable minds could differ."). Ultimately, upon review of the record and the parties' arguments, the Court finds that the Agency reasonably determined that Ms. Peters has the requisite six years of project management experience.

As noted, the question before the Court is whether the Agency had a rational basis to find that Ms. Peters had the requisite project management experience as required by the Solicitation. While the Solicitation fails to define the term "project management experience," the Solicitation describes the role of Project Manager as follows:

> Serves as the project manager for a large, complex task order (or a group of task orders) and shall work with the Government Contracting Officer, the contract-level Contracting Officer's Representative (COR), the task order-level COR(s), government management personnel and customer agency representatives. This individual is responsible for the overall management of the specific task order(s) and ensuring that the solutions and schedules in the task order are implemented in a timely manner. Responsible for the overall quality of the tasks' deliverables. Manage subcontracting agreements in accordance with government terms and requirements.

AR385. Beyond six years of project management experience, the Solicitation requires that the candidate:

> Demonstrate strong diplomatic skills to ensure effective and respectful collaboration across diverse cultural contexts and have expertise in International Public Health, infectious disease, capacity building, health equity, strategic planning, communications, and/or global HIV/AIDS programs – including PEPFAR and the Global Fund[.]

*Id.*

Veritas argues that the Solicitation reserved the determination of what qualifies as "project management experience" to the Agency's technical evaluators. Veritas MJAR at 24. Though

DevTech asserts that Ms. Peters lacks the requisite six years of experience, it fails to clearly define project management experience. *See* DevTech MJAR at 26–27; DevTech Resp. MJAR at 18–19; Sur-Reply at 2; OA Tr. 26:13–22. Based on its statements in multiple filings and at oral argument, DevTech seems to assert that a project manager is the Agency's go-to contact for contract deliverables who would be expected supervise other personnel and manage complex contracts. *See* DevTech MJAR at 26–27; DevTech Resp. MJAR at 18–19; Sur-Reply at 2; OA Tr. 26:13–22.

As key personnel are part of the Solicitation's Technical Proposal, the Court owes deference to Agency's personnel determinations. AR383–84; *see Off. Design*, 951 F.3d at 1373; *see also Galen Med.*, 369 F.3d at 1339 ("[T]he technical evaluation [is] an inherently judgmental process requiring deference."); *E.W. Bliss*, 77 F.3d at 449 (noting that "a court will not second guess" certain matters, such as "technical ratings . . . , which involve discretionary determinations of procurement officials"). DevTech bears the heavy burden of proving that the Agency's conclusion lacked any rational basis. *Centech*, 554 F.3d at 1037 (quoting *Impresa*, 238 F.3d at 1332). DevTech cannot carry this heavy burden to show that the Agency's decision was arbitrary and capricious. *Id.*

The Agency reasonably determined that Ms. Peters was qualified. First, based on Ms. Peters's resume entries, the Agency was well within its discretion to find that Ms. Peters was qualified. Second, the Agency fully considered and documented its determination that Ms. Peters was qualified through its TEP and final report.

After reviewing Ms. Peters's resume, the Court finds that the Agency rationally could have credited Ms. Peters with the requisite six years of project management experience. Ms. Peters's resume indicates that she held multiple team lead positions from February 2016 through November 2018. AR1668. Though DevTech contends that team lead positions do not count as project

manager positions, the Court finds that the Agency could reasonably credit Ms. Peters's time spent as a team lead as having project management experience, given that she would have been overseeing technical experts. DevTech Resp. MJAR at 17–18 (explaining that a team lead oversees other technical experts). She further was a lead technical writer from December 2016 to October 2017. AR1668. This reasonably could have entailed managing other technical writers. Thus, the Agency could rationally have credited Ms. Peters with project management experience for this role. Ms. Peters also served as a Strategic Solutions/Technical Advisor for over three years from March 2019 until September 2022. AR1667. That role involved "[s]upport for PEPFAR and USAID investments in South Africa's" programs, "[t]echnical assistance in . . . strategic planning[] and knowledge management," and "[s]upport for HIV & TB programs at [multiple] levels in South Africa and Mozambique." *Id.* Ms. Peters's resume also indicates that she served as a Lead Technical Writer/Editor. *Id.* The entry does not include dates, but notes that Ms. Peters's worked on "[s]trategic design, drafting, and editing of concept notes, technical proposals, and programmatic reports" and "[c]ollaborat[ed] with URC and partners for various USAID activities." *Id.* This, too—namely the collaboration across agencies and management of proposals and program reports—may well fit within the project manager's required skills. AR385; AR1667. These roles, which rationally could be credited as project management experience, collectively span more than the six-year minimum required in the Solicitation.[10] AR1667–68; *see also*

---

[10] In total, the Court counts 75 months of experience on Ms. Peters's resume that could reasonably qualify as project management experience. *See* AR1667–68. These roles include (i) strategic solutions/technical advisor (43 months); (ii) team leader at MSI (5 months in 2018); (iii) team leader at Khulisa (6 months); (iv) lead technical writer (11 months); (v) team leader at MSI (5 months in 2017); and (vi) team leader at GH Pro (5 months). This exceeds the minimum of 72 months—six years—of project management experience required by the Solicitation. AR385. This does not include her most recent position as a "Lead Technical Writer/Editor," as the resume does not include any dates for that position. AR1667.

*Honeywell*, 870 F.2d at 648 ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.").

The Solicitation also indicates that the Agency may have had a more holistic view of the project manager requirements. Indeed, beyond the minimum years of general and project management experience, the Solicitation requires that the project manager have "strong diplomatic skills," the ability to "respectful[ly] collaborat[e] across diverse cultural contexts," and experience in public health, specifically with HIV/AIDS programs. AR385; *see* AR394. Therefore, while DevTech correctly asserts that, in general, a project manager oversees a project, the Solicitation could reasonably support a broader view of project management, as evidenced by the position requirements. DevTech Resp. MJAR at 18–19; AR385. More importantly, in this situation, the Agency, not the Court, should make this determination. *See Oak Grove*, 116 F.4th at 1374, 1380; *Insight Pub.*, 161 Fed. Cl. at 797.

Taking this broader, more holistic view of the requirements, Ms. Peters is certainly qualified under the terms of the Solicitation. *See* OA Tr. 103:17–104:11 (Agency counsel agreeing that the project manager requirements are "a set of holistic criteria for the [A]gency to consider"). Indeed, the Solicitation requires that the Project Manager "[d]emonstrate strong diplomatic skills . . . and have expertise in International Public Health." AR385. Ms. Peters has extensive experience in the public health and HIV/AIDS space, and has collaborated, led, or worked on large teams, all requiring diplomatic skills. AR1666–69. The summary of her qualifications begins by explaining that she has "[o]ver twenty-five years of experience in public health," including "[t]echnical expertise," "evidence-based decision-making," and "strategic planning." AR1666. She has "led or participated in more than ten USAID evaluations." *Id.* Her resume indicates four

positions with experience relevant to PEPFAR, AIDS, or the Global Fund, all experience specifically sought after by the Agency through the Solicitation.  AR1667–68; AR385.  Ms. Peters's other roles also reference public health initiatives.  AR1666–69.  Ms. Peters has experience "[m]anag[ing] the preparation and delivery of final reports for project completion," "[l]ead[ing] in evaluations for major health programs," and "collaborat[ing] effectively" with various parties.  AR1666–67.

Finally, the Agency appropriately considered Ms. Peters's experience, as evinced in the Agency's Consolidated Evaluation Report.  The Report reflected that Veritas was awarded four strengths and no weaknesses, significant weaknesses, or deficiencies.  AR2098.  The Report also recognized that "[a]ll key personnel meet and exceed the minimum required experience, *including global health and HIV/PEPFAR experience*."  *Id.* (emphasis added).  Indeed, Veritas received an "Outstanding" rating for its personnel.  *Id.*  This not only demonstrates that the Agency viewed PEPFAR experience as important, consistent with the Solicitation, but it also demonstrates that the Agency concluded that Veritas's personnel possessed the required experience.  DevTech argues that the Agency "overlooked this key shortcoming" in Veritas's proposal, and, for the first time at oral argument, claims that the Agency did not provide any rationale for its decision.  DevTech MJAR at 29; OA Tr. 33:16–23.  This argument fails, however, because the Agency (i) is entitled to a presumption of regularity, (ii) need not document all of its findings, and (iii) properly considered—and found sufficient—Veritas's project manager's experience.  AR2098; *DynCorp Int'l*, 10 F.4th at 1313 (quoting *Impresa*, 238 F.3d at 1337); *Impresa*, 238 F.3d at 1338 (citing *Bowen*, 476 U.S. at 626–27); *see also Advanced Data*, 216 F.3d at 1058 (noting that the "highly deferential" arbitrary and capricious "standard requires a reviewing court to sustain an agency

action evincing rational reasoning and consideration of relevant factors." (citing *Bowman*, 419 U.S. at 285)).

The relevant question for this Court is not whether it would have hired Ms. Peters as the project manager. Instead, the Court must determine whether the Agency had a rational basis for making its decision. *Harmonia Holdings*, 999 F.3d at 1408 (noting that the Court's "role in reviewing procurement decisions, . . . is not to evaluate the offerors' proposals anew or to substitute [its] judgment for that of the agency"); *Honeywell*, 870 F.2d at 648 ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."). Here, based on Ms. Peters's resume and the requirements in the Solicitation, and, given the deference the Court owes to agency determinations regarding a technical approach, the Court cannot say that the Agency's action was arbitrary and capricious. *See Oak Grove*, 116 F.4th at 1374, 1380; *E.W. Bliss*, 77 F.3d at 449 (noting that "a court will not second guess" certain matters, such as "technical ratings . . . , which involve discretionary determinations of procurement officials"); *Insight Pub.*, 161 Fed. Cl. at 797.

> **b)     DevTech Cannot Establish Prejudice Arising Out of the Agency's Evaluation of Veritas's Project Manager.**

DevTech cannot establish prejudice related to the Agency's evaluation of Veritas's project manager because its own proposed project manager lacks the qualifications required by the Solicitation. At oral argument, after the Court raised issues about DevTech's project manager's own requirements, DevTech requested a Sur-Reply to address the issues. OA Tr. 127:15–130:21. The Court specifically instructed DevTech that the Sur-Reply must be consistent with and "operate within th[e] constraints" of DevTech's statements at oral argument. *Id.* at 133:4–134:13. In its Sur-Reply, DevTech argues that any focus on its own project manager is a post-hoc rationalization.

Sur-Reply at 4.  DevTech asserts that because the Agency evaluated its project manager and gave the project manager a strength, the Court should not consider the qualifications of its project manager.  *Id.*  This argument is squarely inconsistent with how DevTech contends the Court should review the Agency's determinations about Veritas's project manager.  DevTech claims that the Agency's evaluation of Veritas's project manager position is "not an area where the agency reasonably could exercise discretion," while also positing that the Agency's assignment of a strength to DevTech's proposed project manager is entitled to deference.  *Id.* at 3–4; *see also E.W. Bliss Co.*, 77 F.3d at 449 (explaining that "a court will not second guess" certain matters, such as "technical ratings . . . , which involve discretionary determinations of procurement officials").  In essence, DevTech asks the Court to review Veritas's proposed project manager without deference to the Agency's finding that Ms. Peters is qualified, but then turns around and tells the Court it must defer to the Agency's finding that DevTech's own project manager, ███████████, was qualified.  DevTech cannot have it both ways—what is good for the goose must be good for the gander.

The Solicitation included certain qualifications for the project manager, including (i) a bachelor's degree from a relevant discipline, (ii) eight years general experience, (iii) six years of project management experience, (iv) demonstrated diplomatic and collaboration skills, and (v) experience in public health including HIV/AIDS, PEPFAR, and Global Fund.  AR385.  At oral argument, counsel for DevTech unequivocally agreed that each of these five requirements must be met by a project management candidate.  OA Tr. 27:6–28:6 (DEVTECH COUNSEL: "I think they're all material and they're minimum requirements.  Absolutely.").  DevTech's proposed project manager, ██████████, plainly lacks at least three of these five requirements: eight years of general experience, six years of project management experience, and experience in public

health, including HIV/AIDS, PEPFAR, and Global Fund.  Thus, DevTech cannot establish prejudice as it relates to the project manager.

*First*, ▮▮▮▮▮▮▮ lacks eight years of general experience.  To meet this eight-year requirement, the project manager must have 96 months of general experience.  ▮▮▮▮▮▮▮ resume indicates the following positions for the following durations: evaluation specialist (17 months)[11]; technical program manager (16 months); senior program associate (31 months); program coordinator (23 months); intern (5 months).  *See* AR676.8–.9.  This experience totals 92 months, four months shy of the minimum.[12]  *See id.*

*Second*, ▮▮▮▮▮▮▮ lacks six years of project management experience, which is precisely why DevTech argues Veritas's project manager does not meet the Solicitation's requirements.  To meet this six-year minimum, a candidate must possess 72 months of project management experience.  The Solicitation did not define "project management experience."  AR385.  All parties agree that job title alone does not establish project management experience.  DevTech Resp. MJAR at 17; Agency MJAR at 31; Veritas MJAR at 24.  Counsel for DevTech agreed at oral argument that ▮▮▮▮▮▮▮ experience as an intern, a program coordinator, and an evaluation specialist

---

[11] ▮▮▮▮▮▮▮ resume indicates that this role began in May 2023 and continued "to present." AR676.8.  The Court calculated the position through September 2024, when DevTech submitted its proposal, as that is the date at which the Agency would have been calculating ▮▮▮▮▮▮▮ experience.

[12] The Court notes that this total includes a five-month internship and counts overlapping months of experience twice.  For example, ▮▮▮▮▮▮▮ resume shows that he worked as a senior program associate from August 2019 until February 2022 and as a technical program manager from February 2022 until May 2023.  The 92-month total includes February 2022 as a month of experience in both positions.  The Court conservatively counts this month twice given the lack of specificity regarding the exact start and end dates.  Even with this conservative approach, ▮▮▮ ▮▮▮▮▮ fails to meet the requisite eight years of overall experience.

would not satisfy its own definition of project management experience. OA Tr. 31:21–32:12. The

Court specifically inquired about each of these roles:

> THE COURT: Is a *program coordinator* a program manager?
>
> DEVTECH COUNSEL: It would be like a junior level . . . but it wouldn't be a manager.
>
> THE COURT: Okay. And an *intern* wouldn't be a project manager, obviously.
>
> DEVTECH COUNSEL: No, ma'am.
>
> THE COURT: Okay. And what about a job where someone *provides technical leadership and managerial support to develop evaluation and research frameworks, like an evaluation specialist*? That's not a project manager either.
>
> DEVTECH COUNSEL: Well, a manager position is certainly getting closer to that area. But, again, a program is all the tasks, not a single task.

*Id.* (emphasis added); *see also* AR676.8 (including in the description for ▮▮▮▮▮▮▮▮▮▮

"Evaluation Specialist" position, "[p]rovides technical leadership and managerial support to

develop evaluation and research frameworks . . ."). Accordingly, DevTech's counsel agrees that

▮▮▮▮▮▮▮▮▮▮ time as an intern, a project coordinator, and as an evaluation specialist do not

satisfy its own definition of project management experience.[13] This leaves only ▮▮▮▮▮▮▮▮▮▮

technical program manager (16 months) and senior program associate (31 months) as potentially

qualifying project management experience, totaling only 47 months. *See* AR676.8–.9. This falls

far short of the 72 required months of project management experience. Even if the Court credited

one of the two positions that DevTech's counsel discredited—the program coordinator (22

---

[13] In its Sur-Reply, DevTech argues that ▮▮▮▮▮▮▮▮▮ experience as an evaluation specialist and program coordinator included project management functions. Sur-Reply at 5–6. This not only conflicts with DevTech's counsel's statements at oral argument, but also conflicts with this Court's instruction that DevTech would be held to the representations made at oral argument. OA Tr. 31:21–32:12, 133:12–21.

months) or evaluation specialist positions (17 months)—███████ would still fall short of the 72-month threshold.  OA Tr. 31:21–32:12; AR676.8–.9; *see also supra* notes 12, 13.

  *Third*, ███████ lacks global health experience, particularly experience with PEPFAR and the Global Fund.  *See* AR676.8–.9.  When asked at oral argument to identify ███████ experience with public health, another requirement of the Solicitation, DevTech could not do so.  OA Tr. 28:7–29:20; AR385.  Instead, DevTech argued that this issue was not properly briefed.  *See* OA Tr. 127:15–130:21.  The issue of DevTech's project manager's qualifications, however, was raised by Veritas in its Responsive MJAR and at oral argument by the Agency in response to the Court's questions.  Veritas Resp. MJAR at 5; OA Tr. 129:7–9.  Even with the Court's leave to brief the project manager issue in a post-argument Sur-Reply, DevTech failed to point to any public health experience on ███████ resume.  *See* OA Tr. 133:4–134:13; Sur-Reply at 1–6.  Nor could it, as ███████ resume shows no Global Fund or PEPFAR experience.  *See* AR676.8–.9.  Instead, DevTech used its Sur-Reply to challenge the requirement as "legally irrelevant," contending that "[t]he Solicitation does not require the Project Manager to have any experience in public health."  Sur-Reply at 5.  This, however, directly conflicts with DevTech's statement at oral argument that each of the requirements in the solicitation for the project manager must be met.  OA Tr. 27:6–28:6 (DEVTECH COUNSEL: "Yes, those are minimum requirements. . . . I think they're all material and they're minimum requirements.  Absolutely.").

  Accepting DevTech's positions that each of the qualifications listed in the Solicitation must be met and its definition of project management experience as true, DevTech cannot establish prejudice because its proposed project manager fails under its own definitions.  *See DigiFlight*, 165 Fed. Cl. at 606.  Thus, to the extent the Agency's acceptance of Veritas's proposed project manager was an error, DevTech benefited from the same error as Veritas and cannot now claim

prejudice.  *Id.*; *see also G4S Secure*, 2022 WL 211023, at *8 ("There has been no prejudice when a bid protestor benefited from the same potentially unlawful discretion from which the awardee benefited."); *VS2*, 155 Fed. Cl. at 768 ("[Protestor] cannot now complain about [awardee and agency's] interpretation of the Solicitation when [protestor] relied upon the very same interpretation when preparing its proposal.").

### B.    Veritas Only Proposed Services Included in Its GSA MAS Price List.

DevTech contends that Veritas's proposal is ineligible for award because it proposed services not included in its GSA MAS price list.  DevTech MJAR at 27–31.  More specifically, it contends that the personnel proposed for three specific positions, RAA, TA/RA, and SSA, were improperly "mapped"[14] to the "Analyst" labor category on Veritas's GSA MAS price list.  *Id.*; AR386–88, AR1752.  Because Veritas properly mapped the positions required by the Solicitation to permissible labor categories in its GSA MAS price list, it proposed services included in its GSA MAS price list.  Regardless, DevTech cannot establish prejudice as its proposal suffered from a similar issue.

Under an MAS contract, the Agency may only procure services included in an offeror's MAS price list.  *See HomeSource Real Est. Asset Servs., Inc. v. United States*, 94 Fed. Cl. 466, 486 (2010), *aff'd*, 418 F. App'x 922 (Fed. Cir. 2011).  If an agency seeks to procure services not included on a bidder's MAS price list, it must do so with a full procurement process.  *See* FAR 8.402(f)(1), 8.404(a); *Kearney*, 2024 WL 2209767, at *11.  Thus, if the Agency purchases services not included on Veritas's MAS price list, the procurement would be invalid.  There is, however, "no 'prohibition on the government's common sense identification of overlapping, related labor

---

[14] In this context, "mapping" references the identification of which labor category an offeror's MAS contract will be used to fill each role specified in the Solicitation.  *See Kearney & Co., P.C. v. United States*, No. 24-162, 2024 WL 2209767, at *6 n.9 (Fed. Cl. Apr. 30, 2024).

categories.'" *Kearney*, 2024 WL 2209767, at *6 (quoting *Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 227 (2008)). Given the generality of GSA MAS contracts, the "default rule" is that offerors can map the work specified in the Solicitation to their own labor categories. *Id.* As such, "differences in job titles and descriptions between the [Solicitation] and the [labor categories] are not dispositive." *Id.* (citing *Eagle Techs., Inc. v. United States*, 163 Fed. Cl. 692, 703 (2022)); *HomeSource*, 94 Fed. Cl. at 486. Rather, as DevTech acknowledges, the correct inquiry "[w]hen evaluating the sufficiency of labor category mapping" is whether "the proposed labor category will satisfy the contract requirements." DevTech MJAR at 28 (citing *HomeSource*, 94 Fed. Cl. at 486–87).

DevTech specifically contends that (i) Veritas's proposed "Analyst" labor category lacks the minimum years of experience required by the Solicitation, and (ii) Veritas's proposed labor category, "Analyst" is a position for "generalist support staff," not for specialized positions. *See* DevTech MJAR at 27–31. Veritas's analyst labor category requires at least four years of experience and a bachelor's degree. AR1752. Each of the RAA, TA/RA, and SSA positions require at least six years of experience. AR386–88. The RAA and TA/RA positions require those six years of experience be "within HIV care setting, Public health programmatic and policy experience," while the SSA position requires "6 years basic to intermediate knowledge of evaluation design." *Id.*

Veritas properly mapped its analyst labor category to the RAA, TA/RA, and SSA positions, despite the difference in the minimum years of experience. Mapping to a labor category that requires a lower minimum experience than required by the solicitation is proper unless (i) the Solicitation requires an exact match or (ii) the offeror fails to commit to fulfilling the mandatory requirements of the Solicitation. *See Eagle Techs.*, 163 Fed. Cl. at 703; *Kearney*, 2024 WL

2209767, at *6.  Here, the Solicitation did not require an exact match and Veritas's proposal committed to fulfilling the Solicitation's mandatory requirements.

*First*, all parties agree that the labor category and proposed positions need not be an exact match.  *See* DevTech Resp. MJAR at 23 n.4; Agency Resp. MJAR at 20–21; Veritas MJAR at 27–28.  An exact match would only be required where a solicitation mandated such specificity.  *See Kearney*, 2024 WL 2209767, at *5–6.  The Solicitation here did not require an exact match between the labor categories and the required positions.  Instead, it required offerors "identify the GSA schedule and contract utilized, the schedule price, labor categories price used[,] any discounts proposed[,] and any other relevant pricing information."  AR390.  It further required that offerors should include "the labor category(ies) to be utilized for this effort (per task area), a description of the skills and experience per category, [] hourly rate(s) proposed, [] any discounts[,] [and]. . . provide labor categories and labor rates for all Task Areas."  AR390–91.  Veritas's proposal did just this.  *See* AR1732–33; AR1751–60.  The Agency's evaluation reflected its satisfaction with Veritas's proposal when it assigned "Outstanding" ratings for the personnel subfactor and the Technical Proposal overall.  AR2096; AR2098.

Veritas's proposal also "commit[ted] to fulfilling the mandatory requirements of the [Solicitation]."  *Kearney*, 2024 WL 2209767, at *6.  It explained that Veritas "has assembled a complete team . . . who are highly qualified and experienced . . . .  Their work histories cover all tasks identified in the SOW."  AR1657.  Veritas notes that Section 5 of its price volume, "demonstrate[s] the experience of [its] proposed staff in each of the labor categories identified."  AR1658.  The experience is outlined by the biographies and resumes for proposed personnel.  *Id.* The biographies and resumes show that Veritas's proposed staff's experience far exceed the four- and six-year requirements of the analyst labor category and Solicitation.  AR1661; AR1680–83;

AR1684–85; AR1692–94.   Indeed, Veritas's proposed staff for the RAA, TA/RA, or SSA positions have over 15, 24, and 30 years of experience respectively.   AR1680–83; AR1684–85; AR1692–94.   Accordingly, just as in *Kearney*, where the awardee illustrated its commitment to meeting the Solicitation's minimum requirements by noting that the it "evaluates all personnel on a case-by-case basis to ensure that each employee meets or exceeds the minimum requirements of the specific labor categories," Veritas has similarly illustrated its commitment through its proposal and proposed staff, each of whom have well more than the six-years of minimum experience. *Kearney*, 2024 WL 2209767, at *6; AR1660–61; AR1680–83; AR1684–85; AR1692–94.

   *Second*, DevTech's argument that Veritas's analyst position is meant for support staff, not for specialized positions like the RAA, TA/RA, or SSA positions is unavailing.   *See* DevTech MJAR at 29; DevTech Resp. MJAR at 22.   As DevTech recognizes, the key question when evaluating labor category mapping is "if the proposed labor category will satisfy the contract requirements."   DevTech MJAR at 28 (citing *HomeSource*, 94 Fed. Cl. at 486–87).   As discussed above, Veritas signaled its commitment to complying with the six-year requirement by proposing staff all with well over six years of experience.   AR1660–61; AR1680–83; AR1684–85; AR1692–94.   Further, the Agency reviewed the proposed mapping and staffing, and nothing in the record indicates that it thought the proposed staff could not satisfy the contract requirements.   The question of whether the Agency thought that "the proposed labor category will satisfy the contract requirements," is part of the Agency's technical evaluation.   DevTech MJAR at 28 (citing *HomeSource*, 94 Fed. Cl. at 486–87); AR1680–85 (submitting key personnel with Technical Proposal Volume); AR1692–94 (same); AR2071–72 (evaluating DevTech key personnel in technical evaluation); AR2098 (evaluating Veritas key personnel in technical evaluation).   As

such, the Agency is entitled to deference on this discretionary question.  *Off. Design*, 951 F.3d at 1373; *E.W. Bliss*, 77 F.3d at 449.

Finally, even if DevTech is correct that Agency erred in allowing Veritas's labor category mapping, DevTech cannot establish prejudice because its proposal suffers from a similar infirmity. The "Mid-Level Analyst" category that DevTech maps onto the SSA position only requires a minimum of three years of experience.  AR700; AR712.  This is the same error that DevTech contends renders Veritas's proposal ineligible for award.  *See* DevTech MJAR at 27–31. Accordingly, even if Veritas's proposal was deficient for an error in mapping, DevTech could not establish prejudice because DevTech's proposal suffered from similar improprieties.  *See DigiFlight*, 165 Fed. Cl. at 606 ("There has been no prejudice when a bid protestor benefited from the same potentially unlawful discretion from which the awardee benefited." (quoting *G4S Secure*, 2022 WL 211023, at *8)).

## II.    The Agency's Actions Related to DevTech's Proposal Were Not Arbitrary and Capricious.

DevTech alleges that the Agency's (i) failure to complete a professional compensation review and (ii) actions related to DevTech's revised VPAT Proposal, including declining to evaluate the revised VPAT proposals and not conducting discussions related to DevTech's price, were arbitrary and capricious.  *See* DevTech MJAR at 31–38; DevTech Resp. MJAR at 24–31. Neither argument succeeds.  DevTech cannot establish that it was prejudiced by the Agency's failure to evaluate professional compensation pursuant to FAR 52.222-46.  Further, the Agency's actions related to DevTech's VPAT Proposal were not arbitrary and capricious.

### A.    DevTech Cannot Establish That It Was Prejudiced by the Agency's Failure to Evaluate Professional Compensation under FAR 52.222-46.

DevTech contends that FAR 52.222-46, which requires an agency to evaluate professional compensation plans from offerors, applies to the Solicitation here.  *See* DevTech MJAR at 31.  As

such, it argues that the Agency acted arbitrarily and capriciously when it did not evaluate professional compensation for any proposals. *Id.* This compensation analysis is "a sort of targeted form of price realism analysis which 'evaluates whether a proposed compensation is too low.'" *ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 768 (2022) (quoting *Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1346 (Fed. Cir. 2020)).

Even though the Solicitation does not expressly reference FAR 52.222-46, DevTech claims that the provision nevertheless applies because it is incorporated into the Solicitation by the terms of DevTech's and Veritas's MAS contracts through the Ordering clause, FAR 52.216-18. DevTech MJAR at 31–33; FAR 52.216-18 (noting that orders are subject to the terms and conditions of the MAS contract); *see also* Am. Compl., Ex. A (GSA list of contract clauses applicable to Veritas's MAS contract); Am. Compl., Ex. B (GSA list of contract clauses applicable to DevTech's MAS contract). The Agency and Veritas contend that FAR 52.222-46 does not apply because the procurement at issue here is a FAR 8.4 procurement, and FAR 52.222-46 is limited to FAR 15 procurements. *See* Agency MJAR at 37–39; Agency Resp. MJAR at 24–25; Veritas Resp. MJAR at 6–7. Further, they argue that the current Solicitation does not meet the requirements of FAR 22.1103, which directs when FAR 52.222-46 is applicable to a contract. *See* Agency MJAR at 38–39; Agency Resp. MJAR at 24–25; Veritas Resp. MJAR at 6–7. Finally, the Agency and Veritas argue that even if FAR 52.222-46 did apply, DevTech could not show prejudice and waived the argument by failing to bring a pre-award challenge. Agency MJAR at 39–40; Agency Resp. MJAR at 27–28; Veritas MJAR at 35 n.4, 36.

The Court agrees with the Agency and Veritas—DevTech is unable to establish that it was prejudiced by the Agency's failure to evaluate professional compensation under the provision.[15] DevTech cannot establish prejudice here "because it benefited from the same alleged error as the awardee did." *DigiFlight*, 165 Fed. Cl. at 606; *see also G4S Secure*, 2022 WL 211023, at *8; *VS2*, 155 Fed. Cl. at 767–69. In *DigiFlight*, which, like this case, concerned a FAR Subpart 8.4 procurement and a similar dispute about the applicability of FAR 52.222-46, the court concluded that the protestor lacked standing to challenge whether the agency complied with FAR 52.222-46 because it failed to allege the elements of FAR 22.1103. 165 Fed. Cl. at 604–06; *see also supra* note 15 (explaining that DevTech failed to plead or brief the elements of FAR 22.1103). *DigiFlight* continued that even if the protestor had properly pleaded its case, it still would have been unable to establish prejudice where it, too, "did not submit a total compensation plan as would be required by FAR 52.222-46." 165 Fed. Cl. at 606.

DevTech cites a GAO decision to support its contention that FAR 52.222-46 should have applied in this procurement. DevTech MJAR at 33–34 (citing *Skyward IT Sols., LLC*, B-421105.2,

---

[15] Even if DevTech could show prejudice, DevTech fails to plead or argue that the requisite elements of FAR 22.1103 are met. *See generally* Am. Compl.; DevTech MJAR; *see* Agency MJAR at 38. FAR 22.1103 requires a solicitation to include FAR 52.222-46 for (1) negotiated contracts (2) when the contract amount is expected to exceed $750,000 and (3) services are to be provided which will require meaningful numbers of professional employees. FAR 22.1103. Thus, to properly bring this claim, DevTech must have pleaded or briefed these three requirements. *DigiFlight*, 165 Fed. Cl. at 605. While DevTech pleads that the contract amount is expected to exceed $750,000, it does not argue that this is a negotiated contract or that services requiring "a meaningful number[] of professional employees" are to be provided. FAR 22.1103; Agency MJAR at 38; Am. Compl. ¶ 205. DevTech does not respond substantively to the Agency's and Veritas's contentions that this is not a negotiated procurement. Agency MJAR at 38; DevTech Resp. MJAR at 25–26 (responding to contention that it lacks standing under *DigiFlight* without alleging that it had pleaded the relevant elements or attempting to argue that the elements are present). As such, this argument is waived and DevTech cannot argue that the elements of FAR 22.1103 are met. *See Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver.").

2023 CPD ¶ 103 (Comp. Gen. Apr. 27, 2023)).  But there, the GAO reached a similar conclusion as this Court—that an offeror that did not submit a total compensation plan could not be prejudiced by an agency's failure to evaluate compensation plans from offerors.  *Skyward IT Sols.*, 2023 CPD ¶ 103 at 11 ("Despite finding that the agency should have evaluated quotations under FAR provision 52.222-46," the GAO could not "conclude that the agency's error caused . . . any competitive prejudice").

Even if DevTech could show a procurement error and prejudice related to FAR 52.222-46, its claim would be considered waived under *Blue & Gold*.  The conflict between FAR 52.222-46, which requires a compensation plan, and the Solicitation, which did not, would have been obvious to DevTech before the close of bidding.  FAR 52.222-46; AR383–84; AR390–91.  Neither the Agency requested a total compensation plan, nor did DevTech—or any other offeror—submit one.  AR383–84; AR390–91; AR693–722.  As such, if FAR 52.222-46 did apply, DevTech waived its right to challenge this obvious conflict by failing to do so before the close of bidding.  *Blue & Gold*, 492 F.3d at 1313; *see also DigiFlight*, 165 Fed. Cl. at 605–06 ("[U]nder *Blue & Gold*, Plaintiff waived any objection to a FAR § 52.222-46 violation by failing to raise the issue prior to the close of bidding."); *K-Mar Indus., Inc. v. United States*, 91 Fed. Cl. 20, 23 (2010) ("[E]ven assuming that the Army should have amended the solicitation to include [FAR] 52.222–46, [the protestor's] challenge is out of time since it did not 'object to the terms of [the] government solicitation . . . prior to the close of the bidding process. . . .'" (quoting *Blue & Gold*, 492 F.3d at 1313)).

In sum, DevTech's arguments fail because it cannot establish prejudice, and, even if it could, its argument would be considered waived under *Blue & Gold*.

B.    **The Agency's Actions Related to DevTech's VPAT Proposal Had a Rational Basis.**

DevTech asserts that the Agency conducted discussions when it requested a revised VPAT Proposal from DevTech, therefore requiring the Agency to inform DevTech of its "excessive or unreasonabl[y]" high price.  *See* DevTech MJAR at 35–38.  It further argues that the Agency's decision not to evaluate its revised VPAT Proposal was arbitrary and capricious.  *Id.*  Both arguments fail.

1.    **The Agency Did Not Conduct Discussions and Had No Obligation to Inform DevTech That Its Price Was Excessive.**

DevTech argues that the Agency engaged in discussions when it requested revised VPAT Proposals.  DevTech MJAR at 35–38; DevTech Resp. MJAR at 24–27.  Therefore, DevTech asserts that, after purportedly initiating discussions, the Agency should have informed DevTech that its price was "excessive or unreasonable."  *See* DevTech MJAR at 35–38; DevTech Resp. MJAR at 24–27.  The Agency, however, neither conducted discussions nor was required to disclose to DevTech that its price was unreasonable.

As an initial matter, the Agency was not required to conduct discussions.  To begin, solicitations under FAR Part 15 require discussions before an agency issues an award, but solicitations under FAR Subpart 8.4 do not.  *Compare* FAR Subpart 8.4  (no mention of discussion), *with* FAR 15.306(d)(1) (requiring discussion); *Insight Pub.*, 161 Fed. Cl. at 802–03 ("While FAR 15.306(d)(1) requires contracting officers to engage in 'discussions' with 'each offeror within the competitive range,' that provision is not applicable to this Federal Supply Schedule procurement conducted under FAR subpart 8.4."  (quoting FAR 8.404(a))).  It is undisputed that FAR Subpart 8.4 governs this Solicitation.  *See* Am. Compl. ¶¶ 18; 165–66; Agency MJAR at 41; OA Tr. 48:3–6, 95:14–18; *see also* FAR 8.404(a) ("[FAR] Parts 13 . . . , 14, 15, and 19 . . . do not apply to . . . orders placed against Federal Supply Schedules contracts.").

Thus, the Agency was not required to conduct discussions.  *See* FAR Subpart 8.4; *Insight Pub.*, 161 Fed. Cl. at 802; *see also RELI Grp., Inc. v. United States*, 174 Fed. Cl. 630, 638 (2025) ("Because FAR 8.404(a) does not require discussions with all offerors, and because the Agency did not elect to use FAR Part 15 procedures, the Agency was not required to hold discussions with all offerors."); *AccelGov, LLC v. United States*, 170 Fed. Cl. 508, 515–16 (2024) ("Therefore, under the plain language of FAR Subpart 8.4, [the Agency] was not required to follow requirements from FAR Part 15 and hold discussions."); *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 15 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013) ("[U]nder FAR Part 8, [the agency] was under no obligation to hold discussions.").

Next, DevTech incorrectly contends that the Agency's request for DevTech to submit a revised VPAT proposal constituted a discussion.  *See* DevTech MJAR at 36.  Even assuming that FAR Part 15 applies—which it does not—the communications between the Agency and DevTech do not constitute a discussion under the terms of Part 15.  FAR Part 15 distinguishes between "discussion" and "clarifications."  *Compare* FAR 15.306(d)(1) (defining discussions), *with* FAR 15.306(a) (defining clarifications); *see Galen Med.*, 369 F.3d at 1332–33; *Insight Pub.*, 161 Fed. Cl. at 803.  Discussions "are tailored to each offeror's proposal, and must be conducted by the contracting officer with each offeror within the competitive range."  FAR 15.306(d)(1).  "The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation."  FAR 15.306(d)(2).  As such, "'discussions involve negotiations' and 'are undertaken with the intent of allowing the offeror to revise its proposal.'"  *Galen Med.*, 369 F.3d at 1332 (quoting *Info. Tech.*, 316 F.3d at 1321); *see also Insight Pub.*, 161 Fed. Cl. at 803 (noting that the "acid test for deciding whether discussions have been held is whether it can be said that an offeror was provided the

opportunity to revise or modify its proposal" (quoting *Davis Boat Works, Inc. v. United States*, 111 Fed. Cl. 342, 353–54 (2013))); *ENGlobal*, 159 Fed. Cl. at 766 (collecting cases). Meanwhile, "[c]larifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." FAR 15.306(a)(1); *Galen Med.*, 369 F.3d at 1332–33. Without becoming a formal discussion, "offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." FAR 15.306(a)(2).

The communications here were not discussions because (i) the Agency did not provide DevTech with the opportunity to revise its pricing or overall proposal and (ii) the Solicitation provided for award without discussion. *See Galen Med.*, 369 F.3d at 1332–33; *Insight Pub.*, 161 Fed. Cl. at 803. While the Agency did permit DevTech to revise its VPAT Proposal, it did not provide an opportunity for DevTech to revise its pricing or overall proposal—two key features of a discussion. AR391; AR2172–74; *ENGlobal*, 159 Fed. Cl. at 767–71 (concluding an agency's request for new total compensation packages was a clarification, not discussion, because the total compensation plan "operate[d] independently of the Solicitation's . . . evaluation factors (and its best value framework)"). Here, like in *ENGlobal*, the VPAT Proposal operates outside of the Agency's best value framework and evaluation factors. 159 Fed. Cl. at 767–68; AR391 (explaining that the VPAT Proposal is not included in the best value analysis). At oral argument, DevTech pointed to this Court's decision in *Insight Public*. OA Tr. 50:5–9. *Insight Public*, however, does not support DevTech's position. There, this Court recognized that a targeted communication asking an offeror to supplement a portion of its proposal in which the offeror "could not change its pricing" or other key parts of its submission constituted a clarification, not a

discussion. *Insight Pub.*, 161 Fed. Cl. at 803; *see also IBM Corp. v. United States*, 119 Fed. Cl. 145, 158 (2014) ("And by giving [awardee] the opportunity to clarify its proposal regarding the reservation-of-right language, the [agency] did not oblige itself to provide [protestor] with what it seeks here—the opportunity to engage in discussions aimed at reducing its price."). DevTech acknowledged at oral argument that it was not provided the opportunity to revise its price along with its VPAT Proposal. OA Tr. 51:6–15, 58:16–24 (acknowledging that any amendments to the VPAT Proposal would not affect price); *Insight Pub.*, 161 Fed. Cl. at 803. The Agency's clarification with DevTech did not affect the ability of the Agency to obtain its best value as it did not affect pricing or any other factor relevant to the Agency's best value analysis. *See* FAR 15.306(d)(2); AR391. Therefore, the Agency did not conduct discussions. *See Insight Pub.*, 161 Fed. Cl. at 803; *IBM Corp.*, 119 Fed. Cl. at 158. This conclusion is consistent with the Solicitation, which did not provide for discussions. AR391; *see* FAR 15.306(a)(1); *Galen Med.*, 369 F.3d at 1332–33.

*Third*, even if the Agency had conducted discussions—which it was neither required to do nor actually did—the Agency still would have been under no obligation to inform DevTech that its price was too high. DevTech asserts that "[o]nce undertaken, discussions must be equal and must not mislead offerors." DevTech MJAR at 35 (citing *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 385 (2003)). DevTech's reliance on *Miller-Hozwarth* and *WorldTravelService* for the proposition that the Agency was required to inform it that its "price [was] excessive or unreasonable" is misplaced. DevTech MJAR at 35–36 (first citing *Miller-Hozwarth, Inc. v. United States*, 42 Fed. Cl. 643 (1999), *aff'd*, 232 F.3d 905 (Fed. Cir. 2000); and then citing *WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001)). In both cases, other judges of this Court explained that the scope and extent of discussions are left to the discretion of the

contracting officer. *Miller-Hozwarth*, 42 Fed. Cl. at 655 ("The scope and extent of discussions are

a matter of contracting officer judgment." (citing FAR 15.306(d)(3))); *WorldTravelService*, 49

Fed. Cl. at 439 ("Ultimately, both the decision to conduct discussions and the scope of any

discussions are left to the judgment of the contracting officer."). Here, the Agency had concerns

about DevTech's VPAT Proposal only and sought a clarification. Even if considered a discussion,

the scope of that discussion would be "left to the judgment of the contracting officer."

*WorldTravelService*, 49 Fed. Cl. at 439; *see Miller-Hozwarth*, 42 Fed. Cl. at 655.

Although DevTech stated at oral argument that its price "could be construed as excessive

or unreasonable," nothing in the record shows that the Agency found DevTech's high price to be

unreasonable or excessive and DevTech has not shown—or alleged—any bad faith. *See* OA Tr.

23:12–15. Even if the Agency did find it unreasonable, the contracting officer would not have

been obligated to raise the issue of DevTech's high price. *WorldTravelService*, 49 Fed. Cl. at 439;

*see Miller-Hozwarth*, 42 Fed. Cl. at 655. Thus, even if this was a discussion and the Agency was

required to conduct that discussion fairly and reasonably, the Court would find that the Agency

did just that.

*Finally*, even if DevTech could make it past each of the first three hurdles discussed above,

it still stumbles over the final hurdle—prejudice.[16] DevTech is unable to establish prejudice

---

[16] While the Agency argues that prejudice should more broadly preclude DevTech from bringing this protest, the Court only finds prejudice appropriate to consider on certain protest grounds. OA Tr. 62:19–67:20; Agency MJAR at 32–33; Agency Resp. MJAR at 19–20. The cases cited by the Agency regarding prejudice each involve a comparison of the awardee and protestor's pricing. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1563 (Fed. Cir. 1996); *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 24 (2010), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011). For many of the counts in this protest, however, DevTech asks the Court to find Veritas's proposal ineligible for award. OA Tr. 19:13–22. Thus, if DevTech succeeds on its arguments and Veritas's proposal is eliminated from contention, the comparison of Veritas and DevTech's pricing is irrelevant. Even though the Agency argues that offeror ███████ would likely be awarded the contract in place of Veritas if Veritas's proposal is found ineligible, nothing in the record supports that finding and the

because of its high price.  Even if, as here, price is not the most important factor, a "whopping price difference" supports a finding of no prejudice.  *See Allied Tech.*, 94 Fed. Cl. at 24.  For example, in *Archura*, the court found no prejudice where the protestor's price was 29% higher than the highest-price awardee and 73% more than the average awardee's price.  *See Archura LLC v. United States*, 112 Fed. Cl. 487, 498–99 (2013).  In *Analytical & Research Technology*, too, the protestor could not establish prejudice—even in light of a procurement error by the awardee— where its price was $4.5 million higher than the awardee and $3.4 million higher than the government estimate.  *Analytical & Rsch. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 54 & n.19 (1997).

Here, DevTech's price of ███████ illustrates a similar "whopping price difference." *See Allied Tech.*, 94 Fed. Cl. at 24.  DevTech's price was more than five times greater than the Agency's cost estimate of ███████ and more than double Veritas's winning bid of $13,146,516.24.  AR2388.  As such, even if DevTech cut its proposal price in half, it would still have a higher price and one lower overall rating than Veritas's proposal.  AR2385–88.  Because the Solicitation indicated that the Agency would "not make an award at a significantly higher overall cost to the Government to achieve only slightly superior performance," and because where "the evaluation reveals that two (2) or more proposals are approximately equal in non-price factors, then price will become significantly more important," the Agency would not have selected DevTech's higher price for comparable technical ability.  AR391–92.

---

Court cannot substitute its judgment for that of the Agency.  OA Tr. 66:2–67:20; *Harmonia Holdings*, 999 F.3d at 1408.  Therefore, the Court does not address price prejudice where DevTech asks this Court to find Veritas ineligible for the award.

Accordingly, DevTech was not in the active zone of consideration because of its excessive price and did not stand a substantial chance of being awarded the contract. *Colonial Press*, 788 F.3d at 1355; *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999); *see also* OA Tr. 23:12–15 (acknowledging that DevTech's price "could be construed as excessive or unreasonable"). Thus, even if the Court found procurement error, DevTech's bid protest would fail. More specifically, given DevTech's pricing was more than double Veritas's, to establish prejudice, DevTech needed to show that it would have reduced its price significantly to compete with Veritas. *Data Gen*., 78 F.3d at 1562–64. Without such a showing and in light of DevTech's overall high price, DevTech cannot establish that "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id.* at 1562.

### 2.    The Agency's Decision Not to Evaluate DevTech's Revised VPAT Proposal Did Not Prejudice DevTech.

DevTech also argues that the Agency's decision not to evaluate its revised VPAT Proposal was arbitrary and capricious. DevTech MJAR at 36–38; Am. Compl. ¶¶ 219–47. Regardless of that decision was arbitrary and capricious, DevTech cannot establish prejudice. The VPAT Proposal was not part of the Agency's best value decision and was "independent from the other factors" based on the offeror's ability to meet the Section 508 requirements. AR396; *see* AR391; AR2384. Rather, the Agency considered the Technical Proposal (Volume I), the Past Performance Proposal (Volume II), and the Price Proposal (Volume III) in its best value decision, while the HRSA Section 508 compliance team conducted a separate review of the VPAT Proposals. *See* AR391; AR2371–73.

To demonstrate prejudice, a disappointed offeror must demonstrate that "but for the alleged error, there was a substantial chance that [it] would receive an award." *Allied Tech. Grp.*, 649 F.3d

68

at 1326 (alteration in original) (quoting *Statistica*, 102 F.3d at 1581); *see Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353).    Here, even though DevTech's VPAT Proposal was rated red, it did not affect the award decision because the Agency did not immediately disqualify all offerors who received red ratings.    *Id.*    Instead, the Agency provided the four offerors who received red ratings with an opportunity to submit revised VPAT Proposals. AR2374.6–.7 (showing four offerors received red ratings); AR2374.5 (sending revised proposals to Section 508 compliance team).    Ultimately, due to resource constraints, the Agency determined that it would only review "VPAT proposal resubmissions if it impacts the awardee decision from now on."    AR2374.2; *see also* AR2390 (noting that "a second revision would not be conducted . . . for proposals not submitted by the selected awardee").    The contracting officer did not resubmit the revised VPAT Proposals.    This illustrates that the VPAT Proposals did not impact the awardee decision (i.e., that DevTech was not otherwise in contention to be the awardee).    *See* AR2374.2; AR2390.    If DevTech's VPAT Proposal had "impact[ed] the awardee decision," then the Section 508 compliance team would have evaluated the revised proposal.    AR2374.2.    Therefore, the record indicates that DevTech's VPAT Proposal had no bearing on the Agency's award decision one way or another.

Even if the Agency's decision not to evaluate DevTech's revised VPAT Proposal was a procurement error, DevTech would not have prevailed.    Indeed, in a world where DevTech received a green rating after the Agency reevaluated its VPAT Proposal, the Agency still would not have selected DevTech's proposal over Veritas's proposal.    As the Solicitation explained, if "the evaluation reveals that two (2) or more proposals are approximately equal in non-price factors, then price will become significantly more important."    AR391.    The Solicitation also provided that the Agency would "not make an award at a significantly higher overall cost to the Government to

achieve only slightly superior performance." AR392. Thus, the Agency could not have selected DevTech's significantly higher price for nearly identical technical ratings. AR391–92; AR2385–88. Accordingly, DevTech cannot establish prejudice on this issue because regardless of whether the Agency's decision not to review DevTech's revised VPAT Proposal was an error, DevTech did not have a substantial likelihood of receiving the award. *See Allied Tech. Grp.*, 649 F.3d at 1326.

## III.    DevTech is Not Entitled to Injunctive Relief.

The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction. *Centech*, 554 F.3d at 1037. The Court need not progress beyond the first factor because "[t]here can be no injunctive relief without a corresponding prevailing claim." *Obsidian Sols. Grp., LLC v. United States*, 54 F.4th 1371, 1376 (Fed. Cir. 2022). Put differently, a "plaintiff who cannot demonstrate success upon the merits cannot prevail upon a motion for injunctive relief." *Insight Pub.*, 161 Fed. Cl. at 817 (quoting *By Light Pro. IT Servs., Inc. v. United States*, 131 Fed. Cl. 358, 367 (2017)); *see also Dell Fed. Sys.*, 906 F.3d at 999 ("[P]roving success on the merits is a necessary element for a permanent injunction."); *Blue & Gold*, 492 F.3d at 1312 (noting that success on the merits is "the most important factor required to enjoin the award of the contract"). As discussed above, DevTech's protest fails on the merits. Thus, DevTech is not entitled to injunctive relief.

## <u>CONCLUSION</u>

Accordingly, for the reasons stated above, the Court **DENIES** DevTech's Motion for Judgment on the Administrative Record (ECF No. 29); **GRANTS** the Agency's Motion for Judgment on the Administrative Record (ECF No. 30); and **GRANTS** Veritas's Motion for Judgment on the Administrative Record (ECF No. 27).  The Clerk of Court is **DIRECTED** to enter Judgment accordingly.

The parties are directed to **CONFER** and **FILE** a Notice by April 30, 2025, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge